Lipscomb v. Adams.

---

# LIPSCOMB et al. v. ADAMS, Appellant.

**Division One, February 22, 1906.**

1. **CONTRACT TO RECOVER LAND: Unoccupied Portion: Covered by Agreement.** Where the written recorded contract with attorneys, authorizing them by suit to recover 133 acres of land and giving to them for their services one-half of all the money or property received by suit or compromise, clearly by its terms embraces, as a part of the 133-acre tract, the thirteen acres which at the time was not occupied by any one but had been conveyed to an adverse claimant and by her conveyed to the non-resident defendant, defendant cannot, when sued for their interest in the 13 acres by the attorneys, after they had instituted a suit for the other 120 acres occupied by the adverse claimants, and after a compromise had been effected by their client as to all the lands in total disregard of the rights of the attorneys and without their consent, maintain the defense that said small tract was not "recovered" through any litigation by them. The contract determined their right to one half of the small tract.

2. **ATTORNEYS: Contract of Employment: Unconscionable Contingent Fee.** Where a contract employing attorneys to recover 133 acres of land occupied or claimed, under deeds by divers persons, stipulated that their fee should be one-half of all the land recovered, and that half at the time was worth $1,500 to $2,000, their client being without means and soon after they instituted suits she compromised them for such a sum as to indicate that her claim was doubtful or the land was of small value, a court of equity will not refuse to enforce the contract on the ground that the services actually rendered were unconscionably out of proportion to the compensation claimed.

3. **PUBLIC POLICY: Limitation.** To limit the term "public policy" within the bounds of a fixed definition would be to render evasion of the law in that respect a matter of easy invention.

Lipscomb v. Adams.

4. **ATTORNEYS: Contingent Fee.** There is no longer any good reason for holding a contract employing attorneys upon a contingent fee, depending on the amount recovered by the litigation, to be unlawful and contrary to public policy.

5. ———: ———: **Contract Not to Compromise.** A contract by which attorneys are employed to recover land by suit, and stipulating that they are to have one-half of the land recovered, and in which the client agrees not to compromise the suit or claim without their consent and approval, may or may not be unlawful, according to the circumstances of the case. And in this case where the client compromised with her adversaries after suit was brought, and in which, as a result of that compromise, defendant is withholding from plaintiffs under a deed from their client the one-half of the land to which they would have been entitled had not that compromise been made, it is held that the contract not to compromise without their approval was lawful.

6. ———: ———: ———: **Protection to Client.** A contract restricting the client's right to compromise is often a protection of a client who, ignorant and in needy circumstances, is liable to be imposed upon by a crafty adversary.

7. ———: ———: ———: **Conduct of Opposite Party.** It does not lie in the mouth of a party, who by compromising with the client has greatly overreached her, to urge that her contract with her attorneys, by which she was prohibited from compromising the litigation without their approval, was, because it contained such a clause, in contravention of good morals and violative of public policy.

8. ———: **Specific Performance: Client's Contract to Sell: Mutuality and Consideration.** An additional agreement by the client to sell to her attorneys her interest in the land recovered at suit at a specified price, entered into after the contract of employment had been made, if lacking in consideration and mutuality, will not be specifically enforced; and if there is a reasonable doubt about the existence of mutuality of obligation in the additional contract, it will be construed most favorably to the client or her privies.

9. **LACHES: Stale Cause.** Where the defendant has not suffered because of plaintiff's delay in bringing the suit, and the improvements upon the land are of a trifling character, and defendant has received as much income from the land as he paid out in taxes, the action is not stale.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,* Judge.

REVERSED AND REMANDED (*with directions*).

*C. O. Tichenor* for appellant.

(1) The validity of contingent fees has for a long time been recognized by this court, but with limitations. Duke v. Harper, 66 Mo. 57. Such contracts, if upheld, must be clearly stated; must be fair in every respect, and must be sustained by considerations not nominal. Dorr v. Camden (W. Va.), 65 L. R. A. 351. (2) If equity enforces such contracts as those in controversy it must be perfectly clear that the meaning the plaintiffs claim for them is the only meaning which can be given them—there must be no doubt about it; they must not be "vague and uncertain." Wendover v. Baker, 121 Mo. 294. Equity will not specifically enforce a contract unless it be "certain, fair and just in all its parts;" it must be "clear and satisfactory" as to its terms. Dalzell v. Dueber Mfg. Co., 149 U. S. 325. The word "recover" as applied to lands has been and is well known in law. In these two short agreements it is used six times in the first and twice in the last one. "The word recovery should have its ordinary significance, and in that sense the plaintiff cannot be said to recover more than he obtains by his suit." Meyer v. Arnold, 43 N. J. L. 145. "Now what does an action for the recovery of land mean? It means the recovery of possession, and you combine with a claim for that, a claim for the rent." Gledhill v. Hunter, L. R. 14 Ch. D. 500. "To recover in legal proceedings is to be successful in a suit. It is to obtain a favorable judgment." Oxford v. Paris, 33 Me. 181. "Recovery is a word well understood, and when applied to debts, or demands, means recovery by process and course of law." Jones v. Walker, 2 Paine 719. (3) The agreement by a client with his attorney not to settle, does not affect his right to settle for two reasons: (a) because public policy demands an end to litigation and encourages settlements; (b) the other party to the controversy—to the settlement— is not bound by the

agreement between the party and his attorney. This is well expressed in Railroad v. Ackley, 171 Ill. 113. The late statute giving a lawyer a lien for his fees expressly recognizes this right in the client. "The client is still competent to decide whether he will continue the litigation or agree with his adversary." Perie v. Railroad, 152 N. Y. 527. (4) The agreement to sell this tract of land is an entirety; one undivided interest in one tract; one price; one time in which to buy and one person from whom to buy. Hill v. Rich Hill Coal Min. Co., 119 Mo. 9. (5) When plaintiffs made their first contract the relation of attorney and client did not exist; not so when they procured the option to purchase from their client. Before they can enforce such an agreement, the burden rests upon them to show matters which they did not show. Darlington's Estate, 147 Pa. St. 632; Thomas v. Turner, 87 Va. 1. (6) In so far as the right to purchase an undivided one-half interest is concerned, the plaintiffs were barred long before they, brought this suit. In the first place, the right to purchase was a mere option, wholly without consideration; it did not bind them to buy, and they paid nothing for it. "An option was simply given them to purchase the property, or an interest therein, at a stipulated price. What was the consideration for this privilege? No money was paid for it." Davis v. Petty, 147 Mo. 382. Is the fact that they waited over eleven years, manifesting no intention by word or act that they would exercise their option, paying not a cent of purchase money or taxes, evidence that they have "shown themselves ready, and desirous, prompt and eager" to carry out their agreement to purchase? During this long period of time, if plaintiffs are correct in their position, defendant was prevented from selling, mortgaging, leaving or improving the property, while he was compelled, in order to protect it, to pay the taxes. This was not only detrimental to the vendor's interest, but contrary to public policy. They even go

farther and say that equity allowed them quietly to look on and see the land increase in value—at least doubling in value during the eleven years—without a cent invested either in purchase money or taxes, fifty per cent increase enuring to their benefit. Davis v. Petty, 147 Mo. 386; Wendover v. Baker, 121 Mo. 273; Hollman v. Conlon, 143 Mo. 369; S. S. Co. v. Mfg. Co., 125 Mo. 156; Brown v. Massey, 138 Mo. 520; Pomeroy v. Fullerton, 131 Mo. 582; Kroenung v. Goehri, 112 Mo. 648.

*Frank F. Brumback* also for appellant.

(1) The contracts under which respondents claim do not cover or apply to the thirteen acres in controversy. By their terms they only apply to those parts of the specifically described lands that were at the dates of the contracts in the possession of other parties and held adversely to Virginia K. Wachsman. As the thirteen acres were then vacant and not held adversely to Wachsman, the contracts do not give respondents any rights in the thirteen acres. De Graffenried v. Railroad (Ark.), 50 S. W. 272. (2) Virginia Wachsman had the right to compromise the suits in ejectment brought in her name, and convey the land to the adverse claimants. The provision in the contracts that she should not compromise without the consent of respondents made the contracts and the whole thereof absolutely void as against public policy. Railroad v. Ackley, 171 Ill. 100; Davis v. Webber, 66 Ark. 190; Lewis v. Lewis, 15 Ohio 715; Ellwood v. Wilson, 21 Ia. 523; Foster v. Jack, 4 Watts 334; Boardman v. Thompson, 25 Ia. 487; Ford v. Gregson, 7 Mont. 89; Greenhood on Public Policy, sec. 474; Davis v. Chase, 64 N. E. 853. (3) Respondents' alleged right to have their contracts specifically enforced, being an equitable right, is barred by their laches, they having waited over eleven years before taking any action and rights of

other persons having intervened and land having great-
ly increased in value. Respondents cannot lie by and
speculate on their rights, waiting many years, and then
take the land if it prove of advantage to them. Bur-
gess v. St. Louis Co., 99 Mo. 496; Bliss v. Prichard, 67
Mo. 186; Goodson v. Goodson, 140 Mo. 206; Davis v.
Petty, 147 Mo. 374. (4) Respondents cannot recover
because there is no evidence that before bringing this
suit they ever offered to perform their part of the con-
tracts or tendered to appellant the sum of money which
under the contracts they were bound to pay.

*Joseph S. Rust* for respondents.

(1) The contracts were fair and reasonable. (2)
By the contracts Mrs. Wachsman secured the services
of Lipscomb and Rust to adjust the adverse claims, and
secured them on what was then her land, as she had a
right to do. (3) Having created a lien on what was
hers to secure the legal services, everything about not
to settle was merely in effect calling her attention to
the existence of the liens of the contracts. Those not
to settle clauses were surplusage. It were as if the fees
had been secured on the land by a mortgage and the
contract has said she should not settle in violation of
the mortgage. (4) There was no splitting of causes
of action, as all other suits had been dismissed when
this was brought, and this was the only controversy
then in existence. It is now too late to raise that ques-
tion. (5) Plaintiffs were guilty of no laches. They
sued at once when there was some one to sue within the
jurisdiction of the court. (6) Mrs. Wachsman was
insolvent and plaintiffs had no remedy at law. (7) Un-
til Adams gave notice that he disputed Lipscomb and
Rust 's rights, no assertions of rights by him were pre-
sumed to be antagonistic to the rights of Lipscomb and
Rust, and he gave no such notice until 1897, immediate-
ly before this suit was filed. Herbst v. Merrifield, 133
Mo. 267.

VALLIANT, J.—In the first count in the petition plaintiffs seek to have their equitable title to thirteen acres of land in Jackson county adjudged and decreed to them, and in the second count they seek to recover possession of the same, the first count being a suit in equity, the second an action at law.

The main facts in the case are undisputed. In 1872 James Bridger, who was the owner of 287 acres of land in Jackson county, executed a deed of general warranty conveying the land to his daughter Virginia K. Wachsman, for the consideration of love and affection. The 13 acres in suit were a part of those 287 acres. Seven years afterwards, in 1879, Bridger executed two other deeds, by one of which he conveyed (or essayed to convey) 66 acres of the same 287 acres to his son William, and by the other 66 other acres of the same to his other daughter Mary E. Carroll. The 66 acres covered by the deed to Mrs. Carroll, included the 13 acres, the subject of this suit. Those deeds were all duly recorded.

February 23, 1886, Mrs. Carroll and her husband executed a warranty deed conveying the 13 acres in question to Ruben Smith for $350.

June 1st, 1886, Mrs. Waschman, then a widow, without other means than this land, came to the plaintiffs, who were attorneys at law practicing in Kansas City, and proposed to employ them to recover for her the 133 acres of land covered by the two deeds last above mentioned executed by her father in 1879. Thereupon a contract in writing was made in which, after reciting that Mrs. Wachsman was the owner of the 133 acres above mentioned and therein particularly described, that some or all of the land was in the possession of divers persons and that she was desirous of recovering it, it was agreed that the plaintiffs Lipscomb and Rust were to prosecute all necessary suits and render whatever other professional services were neces-

sary to recover the land and for their compensation they were to have one-half of the land recovered, for which she was to make them a deed, and if a compromise was made they were to have one-half of whatever was received, whether money or property, and all contracts in regard to the litigation were to be approved by them. The contract was executed and acknowledged as required by law concerning contracts affecting the title to real estate and was duly recorded June 3d, 1886. Soon after the execution of this contract, to-wit, September 6th, 1886, the plaintiffs brought two suits, for their client Mrs. Wachsman, one against her brother William Bridger for the 66 acres of land claimed by him under the deed from his father, and the other against Mrs. Carroll and her husband for the land covered by the deed from her father to her, except the 13 acres in controversy in this suit. The reason the suit against Mrs. Carroll and her husband did not include these 13 acres was that they had previously, to-wit, February 23, 1886, conveyed the 13 acres by warranty deed to Ruben Smith.

On November 18th, 1886, plaintiffs entered into another contract in writing with Mrs. Wachsman whereby it was agreed that no compromise of the litigation was to be made except with the consent of Lipscomb and Rust, and that should it be agreed to buy from the antagonists their interest or claim in the lands Lipscomb and Rust before taking their half the land were to pay one-half the compromise price. "It is further agreed that if said Mrs. Wachsman shall recover said land, in as much as said Lipscomb and Rust will be entitled to one-half of the same under said contract of June 1st, 1886, and are desirous of owning the whole of said land, said Wachsman for and in consideration of twenty-five hundred dollars to be paid in cash will convey to said Lipscomb and Rust by good and sufficient deed said land free and clear of any incumbrance or claim of any and all persons whomsoever."

That instrument was also duly acknowledged and recorded November 18th, 1886.

After the execution of that document and while the two suits were pending Mrs. Wachsman compromised the matter and dismissed the suits without the knowledge or consent of Lipscomb and Rust; she executed to her brother and sister each a quit-claim deed for $600 for the land claimed by them respectively, including in the deed to Mrs. Carroll the 13 acres now in controversy. Those quitclaim deeds were dated November 26th, 1886, and were duly recorded.

Plaintiffs then brought a suit in equity against William Bridger and Mrs. Carroll to recover the half of the land claimed by them under the contract of June 1st, 1886, which resulted in a compromise by which these plaintiffs paid William Bridger $1050, for a quitclaim to the land claimed by him, and gave Mrs. Carroll 20 acres of the land she claimed, she relinquishing to them the balance. The 13 acres now in suit were not included in that compromise. Lipscomb testified that the reason the compromise did not include the 13 acres was that it was vacant and that Mrs. Carroll had already conveyed her title to Smith.

Defendant Adams claims title to the 13 acres under warranty deeds as follows: Mary Carroll and her husband to Ruben Smith, February 23d, 1886, consideration $350; Ruben Smith and wife to W. H. Adams, June 1st, 1886, consideration $500; Adams and wife to Taylor S. Smith, March 4th, 1897, consideration $650; Taylor S. Smith and wife, quit-claim back to W. H. Adams, January 4th, 1898.

The original suit was against Taylor S. Smith, the quit-claim deed last mentioned was made by him to Adams after this suit was begun and Adams was substituted for Smith as defendant. Adams during all the time covered by this record except a short period was and is a resident of Kansas. Taylor S. Smith was and is a resident of Missouri.

Plaintiffs' testimony tended to show that the land in suit had never been enclosed except temporarily until Taylor S. Smith bought from Adams in 1897, when he enclosed it and thereupon plaintiffs brought this suit.

Defendant's testimony tended to show that Adams had from time to time made use of the land during the ten years following his deed from Ruben Smith and that he had during all those years paid the taxes on it.

There was a good deal of testimony pro and con bearing on the question of adverse possession, but it was not sufficient to sustain the defendant's plea of the Statute of Limitations.

There was a decree for the plaintiffs on the first count of the petition, giving them title to an undivided half of the land by virtue of their contract of June 1st, 1886, and giving them title also to the other undivided half on payment by them to defendant, by a day named, of the sum of $250 estimated by the court as the proportion applicable to the 13 acres of the $2,500 they were to pay Mrs. Wachsman for her half of the whole 133 acres. And on the second count there was a judgment for possession, $30 damages and monthly rents assessed at forty-two and one-half cents; execution, however, was stayed until the $250 should be paid. From that judgment defendant appeals.

I. Appellant presents the point that the plaintiffs acquired no interest in the 13-acre tract in suit for the reason that it was vacant on the date of their contract and was not "recovered" through any litigation conducted by them.

The evidence does show that these 13 acres were vacant at the date of the contract and it does not show that it was included in any suit in court. But the contract expressly describes the 133 acres covered by the two deeds of 1879, and in that description these 13 acres are included. It starts out with the recital that Mrs. Wachsman is the owner of the land and that "divers persons are in possession of some or all of said land

and whereas it is the desire and intention of said Wachsman to recover the possession of said land,'' etc. The contract is not by its express terms limited in its operation to only so much of the land as might then be in the actual, adverse possession of some one. Mrs. Wachsman is presumed to have known that the 13 acres were then not in the actual possession of an adversary and, if she did not intend to engage the services of the plaintiffs to do whatever was necessary to clear her title to the same, there was no necessity for her to have included it as she did in the description of the land in the contract. If there was any title acquired by Mrs. Carroll to any of the 66 acres covered by the deed from her father to her in 1879, it applied as well to these 13 acres as to any of the rest. What defense William Bridger and Mrs. Carroll, or those claiming under either of them, could have made under the deeds of 1879, we do not know; it is intimated in the briefs for appellant that there was a good defense, and that suggestion carries the idea that before Mrs. Wachsman could get rid of the effect of those two deeds she would have to go through a legal battle. Whatever there was in the way of defense of those deeds of 1879 applied as well to the 13 acres as to any of the rest of the land. True Mrs. Wachsman might have gone on this 13-acre piece and built a fence around it, but that would only have changed her position from plaintiff to defendant, leaving her liable, for ten years at least, to be called into court to defend her title. Suppose she had taken that course and had been sued by this defendant for the possession, would she not, under this contract, have been entitled to the professional service of these plaintiffs?

Plaintiffs promptly brought suits in ejectment against the only persons within reach of process; they did not include in either of those ejectment suits these 13 acres because there was no one in possession. They might have brought suit in equity to clear the title and

have obtained service by publication on the defendant Adams who was a non-resident, but before a reasonable time had elapsed in which to enable them to determine what course to take Mrs. Wachsman prevented them taking any further action in her name by compromising with her brother and sister and conveying to the latter these 13 acres within a very short while after the two ejectment suits had been instituted. We hold that the contract covered these 13 acres as well as the rest of the 133 acres.

II. It is argued that the services actually rendered were so little in proportion to the compensation claimed that a court of equity should not enforce it. The contract was for one-half the land to be recovered. Taking the value of the land at that time as estimated by the witnesses, the fee of plaintiffs would have amounted in value to from $1,500 to $2,000, for which the plaintiffs undertook to conduct this litigation, and if they were unsucessful they were to have nothing. What there was before them in the way of professional labor they could not know. Mrs. Waschman had no means to compensate them otherwise than as provided in the contract. The defendant in his answer in the case at bar says that he holds title through a regular conveyance through persons who owned the same adversely to Mrs. Wachsman. That averment indicates that at the time Mrs. Wachsman made this contract of June 1st, 1886, she had a contest before her. It is true, the work actually performed was not great, because soon after the suits were instituted Mrs. Wachsman compromised them, and the price she received shows either that she did not consider that she had a certain victory in sight or else that the land was not then of such value as to render the contingent fee she had agreed to give unreasonable, or else it demonstrates the wisdom for her own protection of that clause in the contract which forbade her to compromise without the approval of her attorneys. There is nothing in the con-

tract on this point that would cause a court of equity to refuse to enforce it on the ground that it was against conscience.

III.   The point on which appellant most earnestly insists is that the clause in the contract of November 18th, 1886, by which Mrs. Wachsman agrees not to compromise without the consent of her attorneys is contrary to public policy and therefore void.

An agreement of this kind may or may not be condemned as against public policy, according to the circumstances of the case; each case must be judged in the light of its own facts.   In 23 Am. and Eng. Ency. Law (2 Ed.), 456, it is said: ''Public policy is in its nature so uncertain and fluctuating, varying with the habits and fashions of the day, with the growth of commerce, and the usuages of trade, that it is difficult to determine its limits with any degree of exactness.'' In a note to the text is a reference to a California case quoting the definition of public policy from Story on Contracts, sec. 546: ''It has never been defined by the courts, but has been left loose and free of definition, in the same manner as fraud.   This rule may, however, be safely laid down, that whenever any contract conflicts with the morals of the time and contravenes any established interest of society, it is void as being against public policy.''

To limit the term ''public policy'' within the bounds of a fixed definition would be to render evasion of the law in that respect a matter of easy invention. The law on the subject of contracts for attorneys fees has undergone changes in modern times.   Once it was thought that to contract for a contingent fee was unlawful, but upon whatsoever theory that idea existed in past ages, there is now no good reason for it and we have long since discarded it.   Such contracts are as much for the benefit of the client as for the attorney, because if the client has a meritorious cause of action, but no means otherwise with which to pay for legal ser-

vices, unless he can, with the sanction of law, make a contract for a contingent fee to be paid out of the proceeds of the litigation, he cannot obtain the services of a law-abiding attorney, and if perchance he should find one who would secretly make with him a contract in violation of the law, he might put himself in unsafe hands.

We do not lay it down as a general rule that a contract by which a client agrees not to compromise a suit without the consent of his attorney is not contrary to public policy, for circumstances may well be supposed in which such a contract would be held to be illegal for that reason, but what we now say on the subject of public policy affecting the validity of a contract is said with reference only to the contract now before us.

If the plaintiffs had a right to make this contract why did they not have the right to take security for its fulfillment? Does it conflict with the morals of the times or contravene any established interest of society, to insert into an otherwise lawful contract a clause designed to prevent the perpetration of the very fraud that was attempted to be perpetrated on these attorneys? What more palpable fraud could have been perpetrated than this woman attempted to perpetrate on her attorneys, whose services had already brought her adversaries to terms? The defendant in this case thinks it is immoral and subversive of society to allow the plaintiffs the benefit of that clause in their contract, yet he sees nothing wrong in attempting to withhold from them their half of the land under a deed made by their client in fraud of their rights.

Besides, the agreement restricting the right to compromise is often a protection of a client who, like Mrs. Wachsman for example, in needy circumstances, and ignorant, is liable to be imposed upon by a crafty adversary. By the compromise now in question, Mrs. Wachsman for a total consideration of $1,200 essayed

to convey 133 acres of land to which, as it turned out, she had a perfect title, and which, taking the lowest figure given by any witness, was worth at that time at least $3,000, and as counsel for appellant in their briefs insist was at that time worth a great deal more. Even if she had been under no agreement with her attorneys not to compromise without their knowledge, what can we say of the moral conduct of the party who would deal with this poor old ignorant woman in the absence of her attorneys of record and with what grace can a party who claims under such a transaction talk about contracts that contravene good morals and violate public policy? There is no more honorable class of men than attorneys at law, and as a rule they deal with their clients for their clients' best interest.

The case is discussed in the briefs as if it was the second contract only, to-wit, the one dated November 18th, 1886, that forbade the compromise without the consent of the plaintiffs, but a clause to that effect is also contained in the contract of June 1st.

In the last clause of the contract of June 1st, 1886, in which settlement and compromise are mentioned, the conclusion of the sentence is, ''All contracts in regard to said litigation shall be approved by said Lipscomb & Rust.''

We hold that this contract was not contrary to public policy, and that under it the plaintiffs are entitled to an undivided one-half of the land in suit as compensation for their services rendered and agreed to be rendered.

IV. The plaintiffs' claim to the other undivided half of the land rests on an entirely different basis; it rests on that part of the contract of November 18th, 1886, which provides that Lipscomb and Rust may become the purchasers of Mrs. Wachsman's half on paying to her $2,500. So that as to that half they are seeking a specific performance of a contract to purchase.

The difficulty with that part of the plaintiffs' case is that there is no consideration to support the promise of Mrs. Wachsman to sell her half. The contract is not mutual, Mrs. Wachsman agrees to sell, but Lipscomb & Rust do not obligate themselves to buy. The language is: "It is further agreed that if the said Mrs. Wachsman shall recover said land, in as much as said Lipscomb and Rust will be entitled to one-half the same under said contract of June 1st, 1886, and are desirous of owning the whole of said land, said Wachsman for and in consideration of twenty-five hundred dollars to be paid in cash will convey to said Lipscomb and Rust by good and sufficient deed said land free and clear," etc.

Reduced to its substance that means it was agreed by the parties that when Mrs. Wachsman recovered the land she would convey her half to Lipscomb and Rust for $2,500 cash. But suppose that when that time came Lipscomb and Rust did not care to buy, what could Mrs. Wachsman do about it?

If that clause had been inserted in the first contract, June 1st, the agreement to sell might have been construed as a part of the consideration for the services to be rendered, that is, that in compensation for their services the attorneys were to have one-half the land recovered and the right to buy the other half for $2,500. But this clause was not in that contract, the attorneys by the contract of June 1st had already obligated themselves to render those services for one-half the land to be recovered, Mrs. Wachsman was entitled to that without further burden; therefore, when she took upon herself an additional obligation a new consideration was required to support it.

The meaning of the language employed in that clause is not entirely beyond doubt, and it may be that viewing it from one standpoint it would be susceptible of a construction that would, from the express agree-

193 Sup—35

ment to sell, imply an agreement to buy; that is to say, if at the end of the then contemplated litigation Mrs. Wachsman had been in a condition to sell and had tendered a deed and demanded the price, and been refused, she might have had an action for a breach of the implied contract. But if under that state of the case the contract would be held to be susceptible of that construction, it could be so on the ground that it ought to be construed most strongly in favor of the client. Because when this second contract was made the relation of attorney and client already existed. But when the attorney sues to enforce specific performance of a contract which he made with his client, and which he himself wrote, if there is a reasonable doubt about the meaning of the language in which his obligation is expressed, it should be construed, as to him, *contra proferentem.*

We hold that the agreement of Mrs. Wachsman to sell her half of this land for $2,500 was not supported by any consideration and the plaintiffs are not entitled to a specific performance. [Davis v. Petty, 147 Mo. 382.]

V. The point is made by the appellant that the plaintiffs have waited too long and their cause is stale.

There is no such adverse possession of the land as to bar the plaintiffs' right to sue for their one-half, and defendant has not suffered by the delay. The improvements, if they deserved to be so called, made by defendant before the institution of this suit, were of a trifling character. He himself testified that he got as much off the land as he paid out for taxes. There is nothing in that point.

The only error in the record is in that part of the decree which awards the plaintiffs a specific performance of their alleged contract to purchase Mrs. Wachsman's half of the land.

The judgment is reversed and the cause remanded to the circuit court with directions to enter a decree on

the first count vesting the title to an undivided half of the 13 acres of land in controversy in the plaintiffs, and judgment on the second count for possession of that undivided half, with $15 damages and rents at the rate of twenty-one and one-fourth cents per month from May 16, 1903, until paid, and as to the other undivided half the decree and judgment be entered for defendant, plaintiffs having leave to withdraw the $250 paid into court by them.

All concur.