R. D. SULLIVAN, Appellant, v. MASON MURPHY et al., Appellees.

No. 40038.

SEPTEMBER 26, 1930.

REHEARING DENIED APRIL 10, 1931.

T. A. Goodson, Buell McCash, for appellant.

H. C. & H. C. Taylor, for appellees.

MORLING, C. J.—The mortgage sued on is dated August 6, 1927, and reads:

"* * * That we, Mason Murphy and Mary J. Murphy, husband and wife, * * * in consideration of $1200 in hand paid do hereby sell, convey and warrant unto M. I. Pence * * * the following described premises (describing them) and the said grantors and each of them hereby relinquishes all right of * * * homestead * * * Nevertheless, if the said Mason Murphy and Mary J. Murphy husband and wife, shall pay their note for the above amount due August 6, 1928, with 6 per cent interest * * * and shall pay the taxes upon said premises before delinquent and keep the buildings thereon insured for insurable value until said note and all other claims are fully paid then this mortgage shall be void. And the grantors hereby pledge all the rents * * * to the payment of the debt secured hereby. If, however, any of these conditions are not complied with said note shall become collectible at once * * * and a receiver of the property may be appointed on the application of the mortgagee or his assigns at any time after default hereon * * * The legal holder hereof may at any time advance money to pay taxes or insurance on said property and may procure an abstract of title * * * and the amounts so paid shall be secured hereby. And this mortgage is also expressly made to secure any claim held by the mortgagee against the mortgagors or either of them for any future loans, advances or indebtedness accruing from said grantors, or

either of them, or their assigns to said grantee or his assigns, or his beneficiaries, or any claims that may come into the hands of the said mortgagee, or his assigns, by purchase or otherwise, against said mortgagors or either of them. All money furnished by mortgagee, or his assigns, for taxes or otherwise, shall bear the same rate of interest as the principal debt secured hereby.''

The note described in the mortgage is dated August 6, 1927, payable to the order of M. I. Pence on or before August 6, 1928, for $1200 with privilege of partial payments signed by Mason Murphy and Mary J. Murphy.

The note which is the subject of contention is dated March 12, 1927, for $1500, payable twelve months after date to order of B. S. Armstrong, signed by Mason Murphy, Ray Murphy and Mrs. Ray Murphy. Both notes bear endorsements by the respective payees to the order of the plaintiff dated December 7, 1927—the Pence note without recourse, the Armstrong note without restriction. There is a written assignment of the mortgage from Pence to plaintiff dated December 7, 1927. It was stipulated that the plaintiff would testify that on December 7, 1927, Pence assigned to him in due course the $1200 note and assigned to him the mortgage; that on December 7, 1927, B. S. Armstrong assigned to plaintiff in due course the $1500 note; that plaintiff purchased the notes and mortgage in good faith, for value, before maturity, without notice of any infirmity and relied upon the terms of the mortgage as securing the notes, and but for such terms would not have purchased either of them. It was also stipulated that defendants would testify that they did not have any intention in giving the mortgage to secure the payment of the $1500 note; that part of the land described in the mortgage is their homestead; that the greater part of the money necessary to purchase it was furnished by defendant Mary J. Murphy and she refused to sign the $1200 note and mortgage until Mason Murphy, in whose name the property was at the time, agreed to convey it to her; that Mary J. Murphy got no part of the $1200 represented by the $1200 note but the money received therefrom went to pay a debt of Mason Murphy and it was for this reason that she refused to sign the note and mortgage until Mason Murphy agreed in consideration of her signing it and in further consideration that the homestead was purchased largely with

her money to convey to her the property; that Mason Murphy delayed compliance with the agreement until February 14, 1928, when he executed to Mary J. Murphy a warranty deed of the property subject to a mortgage in the sum of $1200. It was further stipulated that defendants would testify that the mortgage was not read to or by Mary J. Murphy before she signed it; that Mason Murphy had told her that the mortgage secured only the $1200 note. It was further stipulated that the purpose and intent of plaintiff in purchasing the $1200 note and mortgage was to purchase at the same time the $1500 note and bring it under the terms of the mortgage. The court was authorized to consider the concessions as to what the parties would testify the same as testimony given by them on the stand. The record shows no objections to such proposed stipulated testimony or facts.

Plaintiff says in argument in reply:

"There is just one proposition before this court in this appeal: * * * The question is: What are the rights of the appellant, an innocent purchaser for value of the instruments involved; who in purchasing the same justifiably relied upon the solemn averments contained in the mortgage embraced herein, signed and executed by both appellees; who has changed his position to his detriment on the strength thereof, if they now be allowed to deny their binding force; and who has affirmatively pleaded estoppel against both of the appellees."

Under the stipulation the matters to which the parties would testify must be accepted as in the record without objection. As there is no conflict in the testimony it must be found as facts that the mortgage was not read to the defendant wife; that defendant husband told her that the mortgage secured only the $1200 note; that they had no intention in giving the mortgage to secure the payment of the $1500 note, and that the mortgaged premises included their homestead; that the defendant wife had, as between her and the husband, an equitable interest in the property because of furnishing the greater part of the purchase price; that she refused to sign the $1200 note and mortgage until the husband, in whose name the property was at the time, agreed to convey the property to her. It is a just inference from this undisputed evidence that the defendants understood that the

mortgage did not secure the $1500 note. The language of the mortgage would justify the ordinary reader in concluding that its purpose was to secure the payment of the $1200 note named in the condition, the repayment of advances necessary for the protection of the security and future advances to which the parties might agree. The use of printed forms for promissory notes and mortgages is so universal that we may take judicial notice of the custom. The mortgage is well adapted in its phraseology to misapprehension. It is a just inference also that the inducement to the defendant wife to sign the $1200 note which was given for money with which to pay a debt of the husband was to withdraw the property from his dominion and from liability for his debts.

The defendant wife was in no wise indebted upon the $1500 note. It was signed by the husband and two others and presumptively upon its face he would be principal for one-third and surety for the other two-thirds. By the clause in controversy, as plaintiff would have it construed, the wife subjects her property to liability as surety for her husband's debts manifestly contrary to her intention—not merely for his just and acknowledged debts but for all "claims" against him (if acquired by the mortgagee or his assignee). The "claims" against the husband might arise from his voluntary act, or might be incurred involuntarily. They might arise upon contract or in tort. They might be based upon his liability as principal or as surety. The clause is not limited to any particular person as assignee but any usurer or speculator however remote might acquire the $1200 note and mortgage and a "claim" against the husband and enforce the "claim" against the property of the wife and this in the face of her manifest intention to withdraw her property from any liability for the husband's debts. If this clause is sustained a little addition to it by which the wife would incur general personal liability for such claims might be added and would be sustained under similar circumstances. The wife would, on plaintiff's contention, be subjecting her property (in this case the home of her family) to liability to any unforeseen and uncontemplated "assign" of the mortgage which she was giving for any "claim" against her husband that might be acquired by such an "assign."

Under the stipulation the plaintiff must be considered as

testifying that his intention in purchasing the $1200 note and mortgage was "to purchase at the same time the $1500 note and bring it under the terms of the mortgage." The plaintiff stands, therefore, in the position of a confessed speculator at the expense of the property of the defendant wife for a liability not hers and which she had no intention of assuming.

The mortgage was to Pence and did not in his hands secure the $1500 note in question. Pence had no interest in that note. Plaintiff as assignee of Pence acquired no interest in the $1500 note, or in the mortgage as security for that note. He under that assignment stepped into Pence's shoes as owner of the $1200 note and the mortgage securing that note.

Armstrong had no interest in the mortgage. Plaintiff as purchaser of the $1500 note from Armstrong acquired only Armstrong's title to the note. He as assignee of Armstrong acquired no interest in the mortgage.

Plaintiff's asserted right to tack the $1500 note to the mortgage rests upon the clause "and this mortgage is also expressly made to secure any claims held by the mortgagee against the mortgagors or either of them for any future loans, advances or indebtedness accruing from said grantors or either of them or their assigns to said grantee or his assigns, or his beneficiaries, or any claims that may come into the hands of the said mortgagee, or his assigns, by purchase or otherwise, against said mortgagors or either of them." If the latter provision of this clause, under which the plaintiff must claim, gave to the plaintiff the right to tack the $1500 note to the mortgage it was because it was a "claim" against the husband which was acquired by an assignee of the mortgage. The clause is in the nature of a mere power. The plaintiff claims to have exercised that power in his interest and his claim to equitable relief is in substance for the enforcement of the power and of its exercise and the establishment and foreclosure of the lien which he claims to have resulted to him therefrom.

Plaintiff as assignee of Pence obtained no right to foreclose the mortgage for the Armstrong note and as purchaser of the Armstrong note acquired no right from Armstrong to foreclose the mortgage in which Armstrong had no interest. So far as the present case is concerned plaintiff is merely an assignee of the mortgage. Like any other assignee he might have made in-

quiry of the parties to the contract concerning equities and may not claim exemption from equities because he elected not to make inquiry. The coercive and oppressive clause on which he relies did attract his attention and should have excited his suspicion.

The right at law which plaintiff obtained from Armstrong as purchaser of the $1500 note was the right to a personal judgment against the defendant husband for the amount of the note. That right was recognized in the court below and the plaintiff has judgment against the husband on the note. He has come into a court of equity to obtain affirmative relief which he could not obtain at law—relief by way of enforcement of the power and its execution and of resulting lien and foreclosure of the lien. This relief only a court of equity can give. The defendants are not demanding affirmative relief. They are merely resisting the exercise by a court of equity of its power to grant peculiar equitable relief. As said in Pope Mfg. Co. v. Gormully, 144 U. S. 224, 236, 36 L. Ed. 414, 419:

"But whether this contract be absolutely void as contravening public policy or not, we are clearly of the opinion that it does not belong to that class of contracts, the specific performance of which a court of equity can be called upon to enforce. To stay the arm of a court of equity from enforcing a contract it is by no means necessary to prove that it is invalid; from time to time immemorial it has been the recognized duty of such courts to exercise a discretion; to refuse their aid in the enforcement of unconscionable, oppressive, or iniquitous contracts; and to turn the party claiming the benefit of such contract over to a court of law. This distinction was recognized by this court in Cathcart v. Robinson, 30 U. S. 5 Pet. 264, 276, [8: 120, 124], wherein Chief Justice Marshall says: 'The difference between that degree of unfairness which will induce a court of equity to interfere actively by setting aside a contract, and that which will induce a court to withhold its aid, is well settled. Mortlock v. Buller, 10 Ves. Jr. 292; Day v. Newman, 2 Cox. Ch. Cas. 77. It is said that the plaintiff must come into court with clean hands; and that a defendant may resist a bill for specific performance, by showing that under the circumstances the plaintiff is not entitled to the relief he asks. Omission or mistake in the agree-

ment, or that it is unconscientious or unreasonable, or that there has been concealment, misrepresentation or any unfairness, are enumerated among the causes which will induce the court to refuse its aid.' ''

This doctrine while more frequently applied in suits strictly for specific performance is a general doctrine of equity and not one confined to that particular remedy.

In DeWeese v. Reinhard, 165 U. S. 386, 389; 41 L. Ed. 757, 758, it is said:

"But it is contended by appellant that his suit is something more than one to restrain the action at law; that it is a suit to quiet his title and to hold the appellees as trustees of the legal title for his benefit; that the restraint of the law action is simply incidental to and in furtherance of the main relief, which is the quieting of his title. Assuming for the purposes of this case that his contention in this respect is correct, we agree with the Court of Appeals that the showing in his bill is not one that appeals in the slightest degree to the conscience of a chancellor. The theory upon which the appellant proceeds is substantially that because he has not a legal title a court of equity must enforce and establish his right, or, in other words, that the lack of a legal title creates an equitable duty. We are unable to assent to this contention. Something more than the absence of legal title is necessary to call into action the process of a court of equity. The right, whatever it may be and from what source derived, must be not only one not protected by legal title, but in and of itself appealing to the conscience of a chancellor. A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.''

In McKnight v. Taylor, 1 Howard 161, 168, it is said:

"* * * nothing can call a court of chancery into activity but conscience, good faith, and reasonable diligence; and where these are wanting, the court is passive and does nothing.''

"It is not alone fraud or illegality which will prevent a

suitor from entering a court of equity; any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience." 1 Pom. Eq., 4th Ed., Section 404.

It was held by Lord Hardwick 180 years ago:

"Fraud may either be *dolus malus,* a clear and express fraud, or fraud may arise from circumstances, and the necessity of the person at the time. There are also hard unconscionable bargains, which have been construed fraudulent, and there are instances where even the common law hath relieved for this reason expressly. * * * In these cases too, fraud has been constantly presumed, or inferred from circumstances, and conditions of parties; weakness and necessity on one side, and extortion and avarice on the other, and merely from the intrinsic unconscionableness of the bargain." Earl of Chesterfield v. Janssen, 1 Atkyn's Reports 301, 351, 352.

Of course, fraud must be proved and not presumed, but the doctrine that a transaction may be intrinsically so unconscionable and oppressive as in the absence of explanation to furnish its own intrinsic proof of overreaching or fraud is as sound to-day as it was in Lord Hardwick's time. See 21 C. J. 111; 10 R. C. L. 322.

It is said in Baker v. Massey, 50 Iowa 399, 403, quoting from Kerr on Fraud and Mistake:

" 'If a man, through misapprehension or mistake of the law, parts with or gives up a private right of property, or assumes obligations upon grounds upon which he would not have acted but for such misapprehension, a court of equity may grant relief if, under the general circumstances of the case, it is satisfied that the party benefited by the mistake cannot, in conscience, retain the benefit or advantage so acquired.' "

See also Bottorff v. Lewis, 121 Iowa 27.

"Any contract which has for its object the practice of deception upon the public, or upon any party in interest as to the ownership of property, the nature of a transaction, the responsibility assumed by an obligation, or which is made in order to consummate a fraud upon the people or upon third persons, is

168

void. Greenh. Pub. Pol. 136, 152.'' Merrill v. Packer, 80 Iowa 542, 545.

Public policy has been ''stated to be that whatever tends to injustice or oppression, restraint of liberty, and natural or legal right, or to the obstruction of justice, or to the violation of a statute, and whatever is against good morals, when made the subject of a contract, is against public policy and void. It is said that they are not contracts, but unlawful agreements, which are void in their inception.'' Tarbell v. Rutland R. Co., 51 Atl. 6, 73 Vt. 347, 56 L. R. A. 656, 87 Am. St. Reports 734.

See Griswold v. Illinois Central Ry. Co., 90 Iowa 265, 269; Disbrow v. Supervisors, 119 Iowa 538, 539. See also as to the tendency of the contract to foster litigation Ryan v. Miller, 139 S. W. 128, 236 Mo. 496; Wilson v. St. Louis & W. R. Co. (Mo.), 25 S. W. 527; Illinois Land & Loan Co. v. Speyer (Ill.), 27 N. E. 931; 2 Pom. Eq., 4th Ed., Section 936; 11 C. J. 238; 5 C. J. 892; 5 R. C. L. 278, 283.

The policy of the law is to shield the homestead from liability for the debts of the spouses whose home it is. The law prescribes the conditions under which the homestead may be subjected to the payment of debts. The law does not permit one spouse to grant to the other a power of attorney such as to enable the grantee of the power to subject the homestead to liability for debts. Keeline v. Clark, 132 Iowa 360; Gagliardo v. Dumont, 54 Cal. 496; Wallace v. Travelers Ins. Co. (Kan.), 38 Pac. 489, 26 L. R. A. 806, 45 Am. St. Reports 288. See Morris v. Sargent, 18 Iowa 90.

A waiver of homestead rights is contrary to public policy and void. Rutt v. Howell, 50 Iowa 535; Maguire v. Kennedy, 91 Iowa 272.

We do not have here the case for instance of one who sets up another in business, or one who finances another in some enterprise, or a landlord who puts a tenant in possession of agricultural lands in which it might be desirable and in the interest of both parties to make a bona fide agreement by which he should do all the financing and keep the obligations and security in his own hands. No purpose of the clause under consideration here, especially in view of the circumstances disclosed, other than to oppress and coerce may be reasonably inferred.

The mortgage does not purport to secure the payment of other indebtedness of the mortgagors, or either of them, to or held by the mortgagee at the time the mortgage was executed unless such effect be given to the words "until said note and all other claims are fully paid." There is no assertion that the mortgagee at the time the mortgage was made held any other claims against either of the mortgagors.

In this respect the present case differs from Turnis v. Ballou, 201 Iowa 468, and Corn Belt Savings Bank v. Kriz, 207 Iowa 11, in which the mortgages stipulated that they should stand as security "for any other indebtedness the mortgagee may hold or acquire against the said mortgagor" or either of them, etc. The indebtedness which the respective mortgages were in those cases held to secure was payable to and held by the respective mortgagees at the time the mortgage was given.

Plaintiff argues that he relied upon the clause in question and in such reliance purchased the mortgage and the note specified in it, and also the $1500 note but he was merely relying on his interpretation of a contractual stipulation and on his opinion that a court of equity would enforce it in his behalf. He was merely mistaken in his interpretation and assumption. There was no estoppel. Schoonover v. Osborne, 117 Iowa 427; Holcomb v. Boynton, 151 Ill. 294, 37 N. E. 1031.

On this record, whether we say that on a proper construction of the mortgage it does not envisage the purchase and tacking to the security outstanding liabilities of the mortgagors or that the construction which plaintiff asserts would, if correct, make the mortgage inherently or under the facts of the case fraudulent or against public policy or repugnant to the policy of the homestead laws of the State, the plaintiff's case is so unconscionable as to repel him from a court of equity.

For similar cases see Belton v. Bank, 186 N. C. 614, 120 S. E. 220; Monroe County Bank v. Qualls (Ala.), 125 So. 615.— Affirmed.

DE GRAFF and ALBERT, JJ., concur.

EVANS and KINDIG, JJ., specially concur.

EVANS, J.—(Specially Concurring). I concur in the affirmance of the judgment below. I do so on the ground that the

result thus reached is clearly consistent with the intent of the original parties to the contract, as indicated by the terms of the contract itself; whereas the contrary result would clearly be a perversion of the purpose of such original parties. Though the mortgage is somewhat profuse and confusing in its terms, and perhaps contradictory to some extent, yet it contains a proviso which purports to put an interpretation upon the scope of the mortgage as relating to other indebtedness than the $1200 note. This proviso purports to secure any "claims held by the mortgagee against the mortgagors or either of them for any *future* loans, advances or indebtedness accruing from said grantors or their assigns to said grantee or his assigns," etc. The mortgage did not in terms purport to secure any other *presently existing* indebtedness than the $1200 note. In addition to the $1200 note it did purport to secure "future indebtedness accruing from said grantors." Clearly this proviso contemplated a future meeting of the minds of the parties to the contract upon the accrual of the future indebtedness. So far as the presently existing indebtedness was concerned, the minds of the parties met only upon the $1200 note. So far as future indebtedness was concerned, the meeting of the minds was incomplete and contingent upon a future meeting of such minds upon the creation of such future indebtedness. There was no expression of intent of the parties to extend the security of the mortgage to presently existing indebtedness owing by the mortgagors to third parties. The $1500 note was a presently existing debt owing by one mortgagor to Armstrong, but the mortgagee Pence had no interest therein or perhaps knowledge thereof. Clearly the security of said $1500 note was not within the contemplation of either party to the mortgage at the time it was made. If this note was not within the contemplation of the parties to the mortgage at the time it was made, it could not come within such contemplation later except by a meeting of the minds of the parties thereon. If, after the mortgage had been made, a note had been executed for indebtedness created since the execution of the mortgage, then the minds of the parties would have met in the creation of the indebtedness and would fit into the terms of the mortgage, which provided for such a contingency. The enlarged scope of the mortgage which is sought to be established by the appellant, originated not in the minds of the parties to the mortgage, but

in the mind of a stranger thereto, who while still a stranger to the mortgage, conceived a scheme whereby the $1500 note held by Armstrong might be brought within the apparent terms of the mortgage. No interest of either party to the mortgage was subserved by this scheme. Having carried out the scheme the appellant claims the status of an innocent purchaser for value. Purporting to occupy such status, he claims to be bullet-proof against defenses which the mortgagor might have interposed against the mortgagee. As purchaser and owner of the two notes acquired from Pence and from Armstrong respectively, we may accord to him the status, which he claims. Such status affords him no leverage in his attempt to enforce the scheme inaugurated by him. His status as a holder in due course under the N. I. L. or as the purchaser of property under the Recording Acts operates no further than to protect his *title* to the property, which he has purchased. He purchased for value the $1200 note. Such purchase carried with it the security therefor. His title to such note is not assailed; nor is his security therefor challenged. He purchased from Armstrong the $1500 note. Armstrong had no security therefor. The purchaser therefore acquired no security by the purchase. His *title* to the $1500 note thus acquired from Armstrong is not challenged. This is as far as the N. I. L. or the Recording Acts can carry him. But appellant is unwilling to stop here. His further claim is that the mortgage given to secure the $1200 note contained certain additional contractual provisions, which are operative in his favor and which entitle him to bring his $1500 note within the scope of the $1200 mortgage. If he has such right, it is not a Negotiable Instrument in his hands, nor is it included within any provision of the Recording Acts. If he holds such a right, he holds it as a mere assignee. As such assignee, from whom did he acquire it? Not from Pence, the mortgagee because no such right existed in favor of Pence at the time he disposed of the mortgage; not from Armstrong because Armstrong had no such right when he sold the note.

The argument for the appellant at this point must necessarily be that he acquired this right, not from his assignors and therefore not as a purchaser, but acquired the same *after* his purchase and because of his purchase and as the logical necessity of his purchase of both notes. This is only saying that he ac-

quired such right by virtue of his own scheme, which was participated in by neither mortgagor nor mortgagee, nor by any endorser. His scheme involved no meeting of minds. He relies wholly upon the operation of his own mind as having conferred upon him a right, which neither of his assignors ever had. Elementary it is, that the right of an assignee is limited in its scope to that of his assignor. Clearly therefore the status of the plaintiff, as an innocent purchaser for value of the two notes in question affords him no aid whatever in the enforcement of his larger scheme. No one challenges his title to the notes or denies him the security carried by the notes at the time of his purchase thereof. It is argued that this defense is simply an attempt to obtain reformation of the mortgage and that such reformation can not be had as against an innocent purchaser. If the defendants were entitled to reformation as against the mortgagee, they would be no less entitled thereto as against his mere assignee. Such, the appellant is. It may be that the question here under consideration could have been dealt with more readily in a suit for reformation. But we have no occasion to consider that question. The appellant, as plaintiff, is in a court of equity and is asking to enforce an alleged agreement, which, if such would be unconscionable, to say the least.

As already stated, there are terms in the mortgage that are confusing and more or less self-contradictory. The fact remains that it is fairly capable of the construction herein put upon it; and this is specially so in the light of the interpretative proviso above quoted. So construing the terms thereof, the plaintiff has no right to have the $1500 note included within the scope of the mortgage-security.

KINDIG, J. joins herein.

GRIMM, J. (Dissenting) : I do not concur in the opinion of the majority. I can best express my views by treating the case as I interpret the appeal.

This case comes on appeal upon the pleadings and a stipulation, from which it appears that on August 6, 1927, Mason Murphy, one of the defendants herein and the then owner of the real estate embraced in this cause of action, and his wife, Mary J. Murphy, mortgaged a tract of land, consisting of about two

acres, to one M. I. Pence. The mortgage contains the following language:

"And this mortgage is also expressly made to secure *any claims* held by the mortgagee against the mortgagors or either of them for any *future loans,* advances or *indebtedness* accruing from said grantors or either of them or their assigns to said grantee, or his assigns or beneficiaries, *or any claims which may come into the hands of said mortgagee or his assigns, by purchase or otherwise, against said mortgagors or either of them.*" (Writer's italics.)

We are here concerned only with the words "or any claims which may come into the hands of said mortgagee or his assigns, by purchase or otherwise, against said mortgagors or either of them."

On December 7th, 1927, Pence assigned the mortgage and $1,200.00 note secured thereby to the appellant Sullivan, a *bona fides* purchaser thereof, in due course, without any notice of any alleged infirmities in said note or mortgage. The due date of said note was August 6th, 1928, and Sullivan in purchasing the same, paid the full value therefor and took an assignment of the mortgage. On the same day, December 7th, 1927, Sullivan purchased a promissory note given by Mason Murphy, in the principal sum of $1,500.00, payable to B. S. Armstrong, due March 12th, 1928. In the purchase of this $1,500.00 note from Armstrong, Sullivan was a purchaser in good faith, in due course, without any notice of any alleged infirmities in said note and mortgage, and Sullivan paid Armstrong full value for said note.

It is agreed that Sullivan, in the purchase of each of said notes, relied upon the terms and provisions of the mortgage as security for the notes, and but for the terms of the said mortgage the plaintiff would not have purchased either of said notes. The mortgage was duly filed for record and recorded on the 6th of August, 1927, in the office of the Recorder of Deeds, Davis County, Iowa. On behalf of the defendants it is agreed of record that if Mason Murphy and Mary J. Murphy were to testify, they would state that they did not have any intention, in the giving of the mortgage embraced in this cause of action, to secure the payment of the note dated March 12th, 1927, for $1,500.00.

It is conceded that part of the land embraced in the mort-

gage herein sought to be foreclosed is the homestead of the defendants, that the greater portion of the money necessary to purchase said homestead was furnished by the defendant Mary J. Murphy, and further that at the time of the execution of the $1,200.00 note and mortgage sued upon, the said Mary J. Murphy refused to sign said note and mortgage unless and until the said Mason Murphy, in whose name said property rested at said time, agreed and promised to convey to the said Mary J. Murphy said whole two acre tract; that the said Mary J. Murphy received no part of the money represented by the $1,200.00 note sued on, but the money thereby received went to pay a debt of Mason Murphy. That it was for this reason that the said Mary J. Murphy refused to sign the note and mortgage of $1,200.00 until the said Mason Murphy agreed, in consideration of her signing said note and mortgage, and the further consideration that the said homestead was purchased largely with money belonging to her, to convey to her said property. That said oral agreement was made by Mason Murphy and in consideration thereof the said Mary J. Murphy signed said note and mortgage for $1,200.00. That said Mason Murphy delayed compliance with said agreement until the 14th day of February, 1928, more than two months after the mortgage was given, when the said Mason Murphy executed a warranty deed to the said Mary J. Murphy conveying said two acres, subject to the mortgage. That said deed is now of record in the office of the Recorder of Davis County, Iowa. That said Mason Murphy and Mary J. Murphy will testify that said mortgage was not read to Mary J. Murphy or by Mary J. Murphy before she signed the same. That Mason Murphy had told Mary J. Murphy, not within the hearing of the Notary Public who took the acknowledgment, that said mortgage secured only the $1,200.00 note sued on, herein.

It is further agreed that it was the purpose and intent of said R. D. Sullivan in purchasing the $1,200.00 note and mortgage embraced in this cause of action, to purchase, at the same time, the $1,500.00 note embraced in this cause of action and to bring the said $1,500.00 note under the terms of said mortgage sued upon herein. It clearly appears that no one but Mary J. Murphy and her husband, Mason Murphy, knew either of her refusal to sign the mortgage until the promise to convey was made, or knew that any such promise was in fact made.

The court entered decree and judgment in favor of R. D. Sullivan, in personam, against Mason Murphy and Mary J. Murphy, and in rem against the land involved, in the amount of $1,200.00 and interest figured only up to February 4th, 1929. The court also rendered a decree in favor of the plaintiff, in personam, against Mason Murphy for the amount of $1,500.00 with interest, but finds that the $1,500.00 note is not covered by the mortgage in controversy.

I. One of the main contentions in this case is that the $1,500.00 note is not covered by the mortgage under consideration. Furthermore, the defendants claim they did not understand the mortgage covered the $1,500.00 note. It will be noted that the language of the mortgage is unusually broad: "And this mortgage is also expressly made to secure any claim held by the mortgagee against the mortgagors or either of them for any future loans, advances or indebtedness accruing from said grantors or either of them * * * or any claims that may come into the hands of said mortgagee, or his assigns, by purchase or otherwise, against said mortgagors or either of them." There is nothing ambiguous about this language. It expressly provides, not only for future loans and advances, as between the parties, but expressly provides security for any claims which may come into the hands of said mortgagee or *his assigns* by *purchase or otherwise*, against said mortgagors or *either of them*. It is difficult to conceive how the meaning of the language could be more definitely set forth. To begin with, it is a settled rule that a mortgage may secure not only the amount passing at the time of its execution, but also future advances. Magirl v. Magirl, 89 Iowa 342.

In Collins v. Gregg, 109 Iowa 506, a mortgage on some real estate and a chattel mortgage were given to secure the payment of certain promissory notes and a book account. The instrument contained this language: " 'a sum of money equal to all the claims and evidences of indebtedness that said W. H. Gregg shall have against said B. L. and W. M. Collins.' " By parol evidence it was shown and the court found that future advances were included. This court then says:

"It is urged on the part of plaintiffs that the claims set up by defendant as representing money advanced by him were pur-

chased at a discount, and are now put into the account at their face value. This point is disposed of by our finding as to the settlement, which is conclusive on the parties."

By inference at least, this case recognizes the right to cover by a mortgage not only future advances, but claims held by other parties, purchased even at a discount.

In Corn Belt Trust & Savings Bank v. May, 197 Iowa 54, this court said:

"The authorities hold that the agreement that future advances shall be secured need not even be reduced to writing, but may be shown by parol evidence. * * * It seems to be well settled that a mortgage to secure future advances, even though it does not disclose such purpose on its face, is valid between the parties, or as against any subsequent incumbrancer not prejudiced thereby."

In Turnis v. Ballou, 201 Iowa 468, a similar mortgage clause was under consideration. It was as follows:

" 'It is expressly agreed that this mortgage shall stand as security for any other indebtedness the mortgagee may hold or *acquire* against the said mortgagor, mortgagors or either or any of them; and also for any future advances made to said mortgagor, mortgagors, or either or any of them.' " (Writer's italics).

It will be noted that this clause not only provides for future advances, but provides security for claims which the mortgagor may *acquire* against either the mortgagor, the mortgagors, or either or any of them. The suit was brought by the assignee of the mortgagee. A decree in favor of the plaintiff, the assignee, enforcing such a mortgage was sustained by this court.

In Corn Belt Savings Bank v. Kriz, 207 Iowa 11, the covenant in the mortgage reads as follows:

" 'The said mortgagor hereby covenants * * * second to pay all other indebtedness that the mortgagee may hold or *acquire* against said mortgagor, or either of them, and pay any and all notes and other obligations which the mortgagor, or either of them, may at any time be owing the mortgagee during the existence of this mortgage.' " (Writer's italics).

It will be noted that here also the contested language contains the words "may hold or acquire." A decree for the plaintiff was sustained by this court.

It will be remembered that we are not here dealing with any attempt to reform the instrument. The court, by indirection at least, reformed the instrument and made a new contract for the parties, and this notwithstanding the fact that the plaintiff Sullivan is a *bona fide* purchaser, pleading estoppel against the Murphys.

"* * * as against a subsequent *bona fide* purchaser for value, a court of equity will not relieve a prior party, on the ground of accident, or mistake, by granting a remedy otherwise appropriate, such as setting aside a conveyance which had been executed by the plaintiff under a mistake or ignorance of his rights, or correcting an instrument executed under a mistake of fact." Pomeroy Equity Jurisprudence, Sec. 776.

In Clasey v. Sigg, 51 Iowa 371, this court said:

"That the *bona fide* assignee of a note and mortgage, without notice of infirmities, was not affected thereby, was held in Preston, Kean & Co. v. Case, 42 Iowa 549. This case was followed in Farmers' National Bank v. Fletcher, 44 Id. 252. In both of these cases, as well as the one at bar, the notes secured by the mortgages were negotiable and had been transferred before due. * * * When the bank obtained the note and mortgage there was nothing of record impeaching the mortgage in any respect. Its title thereto was, therefore, perfect and complete, and we are not prepared to say it could not make with safety future advances thereon."

In Carpenter v. Longan, 16 Wallace (U. S.) 271, the defendants Longan and wife executed a promissory note to the assignee of plaintiff, or order, for a certain sum payable at a certain time, and gave a mortgage on certain real estate conditioned for the payment of the note at maturity. Two months before the maturity of the note, the original owner of the note and mortgage assigned the same to the plaintiff. The note not being paid at maturity, suit was brought for the foreclosure of the mortgage. The defendant raised certain defenses against the mortgage. The Supreme Court said:

''The assignment of a note underdue raises the presumption of the want of notice, and this presumption stands until it is overcome by sufficient proof. The case is a different one from what it would be if the mortgage stood alone, or the note was non-negotiable, or had been assigned after maturity. The question presented for our determination is, whether an assignee, under the circumstances of this case, takes the mortgage as he takes the note, free from the objections to which it was liable in the hands of the mortgagee. We hold the affirmative. The contract as regards the note was that the maker should pay it at maturity to any *bona fide* indorsee, without reference to any defenses to which it might have been liable in the hands of the payee. The mortgage was conditioned to secure the fulfilment of that contract. To let in such a defense against such a holder would be a clear departure from the agreement of the mortgagor and mortgagee, to which the assignee subsequently, in good faith, became a party. If the mortgagor desired to reserve such an advantage, he should have given a non-negotiable instrument. If one of two innocent persons must suffer by a deceit, it is more consonant to reason that he who 'puts trust and confidence in the deceiver should be a loser rather than a stranger.' ''

In First National Bank of St. Thomas v. Flath, 86 N. W. 867 (N. D.), the court says, after quoting from Carpenter v. Longan, 16 Wall. 271:

'' 'All the authorities agree that the debt is the principal thing, and the mortgage an accessory. Equity puts the principal and accessory upon a footing of equality, and gives to the assignee of the evidence of the debt the same rights in regard to both. There is no analogy between this case and one where a chose in action, standing alone, is sought to be enforced. The fallacy which lies in overlooking this distinction has misled many able minds, and is the source of all the confusion that exists. The mortgage can have no separate existence. When the note is paid, the mortgage expires. It cannot survive for a moment the debt which the note represents. This dependent and incidental relation is the controlling consideration, and takes the case out of the rule applied to choses in action, where no such relation of dependence.' ''

The $1,500.00 note and mortgage have passed into the hands of an innocent party who purchased both notes for face value and accumulated interest, and who purchased the mortgage when he bought the $1200.00 note. This purchase was made after the mortgage had been placed of record in accordance with law. There is no showing whatever that the original mortgagor knew anything about the difficulties, if any, between Mason Murphy and Mary Murphy, his wife. Whatever was said between the Murphys and whatever verbal agreements, if any were made between Murphy and his wife, were purely secret agreements known to no one else until after this suit was brought. There is no evidence that the plaintiff in this case had any knowledge whatever of any such difficulties, agreements or understandings between the Murphys. The mortgage was duly and properly acknowledged and, as thus acknowledged, it was put on record and was on record at the time the plaintiff purchased the mortgage and the two notes in controversy.

Having thus solemnly executed a written instrument and acknowledged it, and having placed the same on record as notice to the world, they now seek, as a defense to the foreclosure of the instrument, to set up these secret conversations between them and to take advantage of alleged secret agreements between them in reference to the terms of the mortgage and the property covered thereby, and the claim that they did not understand the mortgage covered more than the $1,200.00 note. Included in these claims is the one made on behalf of Mary Murphy that she did not read the instrument. We will deal with this later.

It is clearly shown by the record that no fraud or deceit of any kind was practiced by the original mortgagee upon either Mason Murphy or Mary Murphy. Obviously the plaintiff did not practice any fraud or deceit. At the time of the transaction the property stood in Mason Murphy's name. He was in need of money and as an inducement to Pence, the original mortgagee and plaintiff's assignor, he offered a mortgage to secure the $1,200.00 of money being borrowed, and, as an additional inducement, tendered in the instrument in terms expressly providing that the land covered by the mortgage should also secure the payment of any other indebtedness of Murphy which might come into the hands of Pence, or his assignee, by purchase or otherwise. So far as Pence is concerned, this instrument was of

no different character or force than the instruments in Turnis v. Ballou, 201 Iowa 468, or Corn Belt Savings Bank v. Kriz, 207 Iowa 11.

Each of the instruments in said cases covered all indebtedness the mortgagee might hold against the mortgagor or might *acquire* against the mortgagors, or either of them. The principle having been laid down in the foregoing cases that the mortgagee might foreclose the mortgage not only for the amounts passing at the time of the making of the instrument, but for future advances and also for claims which the mortgagee might *acquire* against either the mortgagor, or the mortgagors, or either or any of them, upon what principle of law or equity can it be said that an assignee of the mortgage and the note, passing at the time the mortgage was executed, should not have the same rights, particularly when, as in this case, the assignee, in good faith and without notice and before maturity paid full value for both the instrument which passed at the time the mortgage was made and the other instrument which he *acquired* after he became an assignee. The original transaction was made for the benefit of Murphy; he needed money. The terms of the mortgage were plain and unambiguous. The mortgagee was guilty of no fraud or concealment or deception of any kind, in procuring the instrument.

Moreover, cases may easily arise in which property owners having outstanding indebtedness to one or more parties may be utterly unable to procure additional loans unless the lender may be able to protect himself by including in the security given for the loan the right to buy up all other claims outstanding against the mortgagors in order thus to protect himself in the security given for the last loan. With such a clause, he may protect the mortgagors from vexatious and expensive litigation and from a dissipation of the property involved. The mere fact that the mortgage in express terms named a consideration of $1,200.00 does not control where it plainly appears in the terms of the mortgage that the mortgage was intended to secure future advances and acquired claims. The amount named as consideration of the mortgage does not limit the amount for which the mortgage may stand as security, if, from the whole instrument, the intent to secure future indebtedness is to be gathered. Citi-

zens' Savings Bank v. Kock (Mich.), 75 N. W. 458; Keyes v. Bump's Admr. (Vt.), 9 Atl. 598.

As previously stated, the property at the time the mortgage was made, stood in the name of Mason Murphy. A part of it was his homestead; the wife joined in the mortgage.

Assuming that the mortgage, if given on property other than the homestead, would be valid and binding as security for the payment of both notes involved, it must be held to be valid and enforceable as against the homestead as well. Here we have an instrument signed by both the husband and wife, and acknowledged by each of them at the same time before the same notary public. This fulfills the statutory requirement · as to alienation of the homestead.

As previously stated, it is not claimed that the original mortgagee practiced any fraud, deception or undue influence over either Mason Murphy or his wife, Mary Murphy. The instrument, therefore, was freely executed and delivered for a valuable consideration in the ordinary course of business in the manner prescribed by the law of this state, that is to say; both parties joined in the same instrument and it was properly acknowledged and recorded as by law provided.

II. It is claimed that Mary Murphy did not read the mortgage before she signed it. It is unnecessary to restate, at any great length, what has so often been said by this court on the subject of the duty of the party signing an instrument to read the same, or have it read to him. Having in mind that the mortgagee used no deception or artifice to prevent Mary Murphy from reading the mortgage and that the original mortgagee did nothing which could in any wise be construed as influencing Mary Murphy not to read the instrument before signing it, we quote from Turnis v. Ballou, 201 Iowa 468, as follows:

"The rationale of the rule estopping a party to a contract from saying that he did not read it, where no fraud, artifice, or ruse is practiced, is well stated by Judge Sanborn in an opinion concurred in by Justice Brewer and Judge Thayer in Chicago, St. P., M. & O. R. Co. v. Belliwith, 28 C. C. A. 358 (83 Fed. 437, 439), as follows: 'A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents

before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. He owes it to the public, which, as a matter of public policy, treats the written contract as a conclusive answer to the question, what was the agreement? If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it unless he has been dissuaded from reading it by some trick or artifice practiced by the opposite party. * * * This is a just and salutary rule, because the other contracting party universally acts and changes his position on the faith of the contract; and it would be a gross fraud upon him to permit one who has received the benefits of the agreement in silence to escape from its burdens by proof that he did not know and did not inquire what these burdens were, when he assumed them. * * * A written instrument cannot be avoided for fraud or mistake unless the evidence of the fraud or mistake is clear, unequivocal, and convincing.' "

See also Houchin v. Auracher, 194 Iowa 606, approving the rule as laid down in McCormack v. Molburg, 43 Iowa 561, as follows:

"The defendant does not state that plaintiffs used any artifice to prevent him from reading the contract, nor does he state that he was unacquainted with the English language, or that he could not read. In fact no excuse whatever is given, except that he signed the contract relying on the representation of plaintiffs as to its contents. This is inexcusable neglect, and the defendant must suffer the consequences of his own folly. The effect of such a rule as that claimed by appellant would be to render written contracts of but little practical value over those existing in parol only."

Here the mortgagee made no representations.

See also First National Bank v. Ten Napel, 198 Iowa 816; Bixler Co. v. Argyros, 206 Iowa 1081, approving the rule laid down in Bonnot Co. v. Newman Bros., 108 Iowa 158, as follows:

"While persons, on the faith of another's word alone, every day sign contracts without reading them, the law has ever adjudged this such indifference as will preclude a remedy in event

of deception. This is on the ground that, having the full means of knowledge and of determination, they nevertheless rely upon the representations of another, having no better facilities for knowing, without themselves exercising the means open for ascertaining the truth.''

See also Charlson v. Farmers State Bank, 201 Iowa 120. Many other cases might be cited along the same line.

The plaintiff pleads estoppel in this case. Without determining whether estoppel obtains, we quote from a few of our cases on the subject.

In In re Estate of McDonald, 167 Iowa 582, this court said:

''Thus where one asserts a fact to be true, and another, in good faith, relying upon the assertion, acts so that to deny it would be prejudicial to him, the party making this assertion cannot afterwards, under such circumstances, assert to the contrary to the prejudice of the other. But in order to create an estoppel it must appear that the other party relied upon the statements made, believed them to be true, and acted upon them, and that to permit a denial thereafter would work prejudice.''

In Sessions v. Rice, 70 Iowa 306, is found the following language:

''Every person will be conclusively presumed to intend to be understood according to the reasonable import of his words; and where a person's words are thus reasonably understood, and justly acted upon by another, such person cannot be heard to aver to the contrary, as against the other. Morgan v. Railroad Co., 96 U. S. 716 (720); Continental Nat. Bank v. National Bank of Com., 50 N. Y., 575 (583).''

As was said in Citizens' Savings Bank v. Kock, 75 N. W. 458 (Mich.):

''It is contended, further, that the parties understood that the mortgages were security only for the amount named in each. *The terms of the mortgage must control this question.*'' (Writer's italics.)

In Helwig, Admr., v. Fogelsong, 166 Iowa 715, the court said:

"A fraudulent intention is not essential to the doctrine of estoppel. It is enough if a fraudulent effect would follow allowing a party to set up a claim inconsistent with his former declarations or conduct."

In Blackman v. Carey, 192 Iowa 548, is found the following:

"If a party to a contract or transaction induces another to act upon the reasonable belief that he will waive certain rights or terms, he will be estopped to insist upon such rights to the injury of him who is misled thereby."

In Hamaker v. Johnson, 199 Iowa 1298, the court approved the following language:

" 'A party may not deny which he has solemnly asserted to be true, when such denial will prejudice one who has relied upon his former statement.' Criley v. Cassel, 144 Iowa 685."

The defendants in this case, by solemn written instrument, acknowledged before a notary public and placed on file, declared:

"This mortgage is also expressly made to secure any claims held by the mortgagee against the mortgagors or either of them for any future loans, advances or indebtedness accruing from said grantors or either of them * * * *or any claims which may come into the hands of said mortgagee or his assigns, by purchase or otherwise, against said mortgagors or either of them.* (Writer's italics).

Can the parties who jointly signed, executed and delivered this instrument and acknowledged it before a notary be now heard to say what their intentions were in signing it, notwithstanding the clear, unambiguous terms of the instrument, particularly when to do so is to permit them to commit a wrong against an innocent purchaser, who relied upon the written instrument as executed, after he found the same on the public records and who paid full value, principal and interest, for the notes in question, before maturity and without any knowledge whatever of any of the claims now being made by the defendants? What would become of the certainty and stability of

written instruments, in the ordinary course of business, under such circumstances?

As was said in Coffin v. Younker, 196 Iowa 1021:

"Equity does not interfere to prevent the enforcement of the express terms of a legal contract, even though, by virtue of circumstances, such enforcement may work a hardship upon one of the contracting parties."

And further as was said in Phillips v. McIlrath, 205 Iowa 1126:

"It is not the province of a court of equity to make contracts for the parties, nor to modify such as may have been voluntarily entered into, merely because the carrying out of their terms may ultimately result in grave injustice to one or the other of the parties thereto."

III. The defendants resist the enforcement of this mortgage on the ground that the clause in controversy is contrary to public policy. In Richmond v. Dubuque & Sioux City R. R. Co., 26 Iowa 191, this court said, in commenting on holding contracts void because of public policy, as follows:

"But further than this, the power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

In Cole v. The Brown-Hurley Hdw. Co., 139 Iowa 487, this court approved the foregoing quotation from the Richmond case and further stated:

"This statement has often been quoted with approval by the courts of other States, and, so far as we are aware, its correctness has never been questioned. So long as the corrupting or impolitic character of the agreement is not so clear as to be readily apparent to the intelligent and impartial mind, the just principles of the law, which hold every man to a fair and full performance of his contract, ought not be made to yield to any doubtful construction of that somewhat variable and altogether undefined thing which we call public policy. While protecting

the interests of the public, the rights and interests of individuals are not to be unnecessarily sacrificed.''

In this Cole case, supra, the court quotes with approval from Kellog v. Larkin (Wis.), 56 Amer. Dec. 164, as follows:

"But I insist that, before a court should determine a contract which has been made in good faith stipulating for nothing that is *malum in se,* nothing that is made *malum prohibilum,* to be void as contravening the policy of the state, it should be satisfied that the advantage to accrue to the public from so holding is certain and substantial, not theoretical or problematical, and I submit that he is the safest magistrate who is more watchful over the rights of the individual than over the convenience of the public, as that is the best government which guards more vigilantly the freedom of the subject than the rights of the state."

This court also approved in said Cole case the language of the English Court in Richardson v. Mellish, 2 Bing. 229, as follows:

"I * * * protest, as my lord has done, against arguing too strongly upon public policy;—it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail."

Quoting further from the Cole case:

"Indeed, without extending citations, it may be said that the consensus of judicial opinion as expressed in the cases is that the power to invalidate commercial and business agreements. on the grounds of public policy is so far reaching and so easily abused that it should be called into action to set aside or annul the solemn engagements of parties dealing on equal terms only in cases where the corrupt or dangerous tendency clearly and unequivocally appears upon the face of the contract itself, or is the necessary inference from the matters which are expressed. The only apparent exception to this general rule is to be found in those cases where the contract, though fair and unobjectionable upon its face, is a part of a corrupt scheme, and is made to disguise the real nature of the transaction."

In Wilson Subdrainage Dist. v. Richardson, 195 Iowa 345, this court said:

"No court should hesitate to declare void any agreement or contract to corrupt or improperly influence the official conduct of any public servant; but it is an equally sound principle which leads courts to declare that, before applying such remedy, and permitting one who has received a valuable consideration for a promise fair upon its face to escape its performance by pleading the invalidity of his own agreement, such fatal defect therein must be so clear as to be free from doubt."

In Liggett v. Shriver, 181 Iowa 260, this court, speaking through Justice Stevens, said:

"In general, however, it may be said that any contract which conflicts with the morals of the times or contravenes any established interest of society is contrary to public policy. We must look to the Constitution, statutes and judicial decisions of the state to determine its public policy, *and that which is not prohibited by statute, condemned by judicial decision, nor contrary to the public morals, contravenes no principle of public policy.* Spead v. Tomlinson, (N. H.) 59 Atl. 376; Lipscomb v. Adams, (Mo.) 91 S. W. 1046; McGuffin v. Coyle & Guss, (Okla.) 85 Pac. 954; Lawson v. Cobban, (Mont.) 99 Pac. 128; Atlantic Coast Line R. Co. v. Beazley, (Fla.) 45 So. 761; Brooks v. Cooper, (N. J.) 26 Atl. 978; Veazey v. Allen, (N. Y.) 66 N. E. 103; McClanahan v. Breeding, (Ind.) 88 N. E. 695." (Writer's italics).

Many decisions of various courts on this subject might be quoted. Generally speaking, the rule is that the public policy of a state or nation must be determined by its constitution, laws and judicial decisions, not by the varying opinions of laymen, lawyers, or judges, as to what the interest of the public demands. Furthermore, the party who seeks to put a restraint upon the freedom of contract in any case must make it plainly and obviously clear that the contract in question is against public policy.

Agreements are not to be held void as being contrary to public policy unless they are clearly contrary to what the legislature or judicial decision has declared to be contrary to public

policy or that manifestly tend to injure the public in some way. Hartford Fire Insurance Co. v. C. M. & St. P. R. Co., 70 Fed. 201, and affirmed by the Supreme Court in 175 U. S. 91. Order of St. Benedict v. Steinhauser, 234 U. S. 640; Cole v. Brown-Hurley Hdw. Co., 139 Iowa 487.

" 'The public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial records.' " Hagan v. Cone (Ga. App.), 94 S. E. 602.

"In a judicial sense, public policy does not mean simply sound policy, or good policy, but it means the policy of a state established for the public weal, 'either by law, by courts, or general consent.' " Clough v. Gardiner, 182 N. Y. S. 803.

See also Lamoille County Savings Bank & Trust Co. v. Belden (Vt.), 98 Atl. 1002, in which the court held that the clause "and shall pay said bank all further sums we or either of us now owe it in any way" included in the mortgage security for a note given by the mortgagor to a third party, and by the third party sold to the mortgagee.

"In this respect, the question in the instant case is therefore not to be determined on public policy, but on the intention of the parties *as gathered from the mortgage itself* under rules applicable to the construction of such written instruments."

The note being considered by the court is known as the Pike note, and C. F. Eddy was the mortgagor. The court said:

"In the absence of any finding of conspiracy, as claimed by the appellant, the mortgage must be given the full operation in this respect, notwithstanding C. F. Eddy gave the Pike note *not understanding or intending that it should be so secured. The intended scope of the mortgage controls.*" (Writer's italics).

Lamoille County Savings Bank & Trust Co. v. Belden (Vt.), 98 Atl. 1002, and cases cited; Collins v. Gregg, 109 Iowa 506.

These rules find support in the cases generally. How can it be said that the clause in question found in the mortgage is violative of any public statute either in letter or in spirit? The only statutory limitation pertaining to alienation of a homestead is, in substance, that the husband and wife must join in

the same instrument. This was done in this case. As has been already pointed out by citations from the decisions of this court, the clause under consideration, found in the mortgage, does not violate any decision of this court. On the contrary, it is entirely in line with our decisions, and to hold that this clause is contrary to public policy and be consistent, this court must necessarily overrule a line of decisions extending over a period of years, particularly Turnis v. Ballou, 201 Iowa 468, and Corn Belt Savings Bank v. Kriz, 207 Iowa 11.

In the final analysis this case involves but one simple proposition, and that is whether or not two competent people, without any fraud, misrepresentation, deceit, or overreaching of any kind, can legally enter into a contract involving property when such contract is based on a valid consideration. As I read the majority opinion, the ultimate result therein announced is that this cannot be done. I think such conclusion violates familiar, basic, and fundamental principles of the law of contract.

No public policy whatever is here involved. It is the well-established rule of this court that a mortgagor can execute a chattel mortgage to cover after acquired property that is not in existence at the time the mortgage is given, and no one has ever suggested that such a contract is against public policy. If this can be done, I know of no logical or legal reason why a mortgagor cannot as well execute a chattel mortgage on his property to cover ''after acquired indebtedness'' acquired by the mortgagee. If the latter is against public policy, then the former must be also. I fail to see any question of public policy involved in either instance.

I repeat, two competent people, without any fraud or other illegal act, have a perfect legal right to enter into a contract in regard to their future property and also in regard to their future indebtedness. The majority opinion denies the right to so contract. To this I respectfully but most firmly dissent.

Justices STEVENS, FAVILLE and WAGNER join in this dissent.