CORN BELT SAVINGS BANK, Appellee, v. EMMA KRIZ et al., Appellants; EDWARD KRIZ et al., Appellees.

MAY 15, 1928.

REHEARING DENIED. DECEMBER 14, 1928.

*L. D. Dennis,* for Emma Kriz, appellant.

*Crissman & Linville,* for Rose Kriz, appellant.

*Ring & Hahn* and *C. J. Lynch,* for Corn Belt Savings Bank, appellee.

*Frank C. Byers,* for Terry-Durin Company, codefendant, appellee.

MORLING, J.—The controverted covenant of the mortgage reads:

"The said mortgagor hereby covenants * * * second to pay all other indebtedness that the mortgagee may hold or acquire against said mortgagor, or either of them, and pay any and all notes and other obligations which the mortgagor, or either of them, may at any time be owing the mortgagee during the existence of this mortgage."

Emma and Rose Kriz claim the existence of confidential relations between them and plaintiff's cashier, Sadowsky, who procured execution of the mortgage sued upon, and who also drew or supervised the drawing of the second note and mortgage held by Rose Kriz. Emma Kriz claims that Sadowsky represented the mortgage sued upon to be, in substance, in the form of a preceding mortgage, securing $1,300 only of the indebtedness now sued for, and that the blanket clause was concealed from her.

Sadowsky was director and reader in the Christian Science Church, of which defendant Emma and her husband were members for fourteen years. She says she was intimately acquainted with Sadowsky, and he was one of her confidential advisors. Plaintiff held a note originally given for $2,000, secured by an ordinary mortgage on the property in question, signed by Edward and Emma Kriz, on which $700 had been paid. Emma and Edward Kriz had domestic difficulties, and in contemplation of divorce, Edward conveyed to Emma the property in question. Emma consulted Sadowsky concerning her troubles, and sought his help, which he promised to grant, and pursuant to which he interviewed Edward Kriz. He says that, after investigation, he concluded that there was fault on both sides, and that, when Emma Kriz found he was not quite as sympathetic with her, she did not come to him any more. Emma says that, in the latter part of 1925, or early part of 1926, Sadowsky informed her that the mortgage would have to be renewed. In another place she says that she received nothing favorable from Mr. Sadowsky concerning reconciliation, and that, after she discussed with him her domestic difficulties, he said that the $1,300 mortgage on the 40-acre farm had to be renewed. "He had it all ready for me." Sadowsky handed her the mortgage. Her testimony is that she was so affected by her trouble with her husband, "crying terribly," and so nearsighted that she could not see anything in the mortgage except what was in large print.

"I could see $1,300. I finally told Mr. Sadowsky I couldn't read it. * * * He said it was not necessary to read it; he said the form was the same * * * as the other, except that it was made in a later year."

He did not say that it was for a greater sum than $1,300. She says that she knew her husband had borrowed money from the bank, prior to signing the note, but did not know the amount; that she had the new mortgage in her hand possibly an hour; that she did not remember whether Sadowsky asked her to read it. "I knew enough that I should read it. * * * I knew the old mortgage was all right." She says:

"When I close my right eye and look with my left, I can't read anything before me. After I commenced to cry, my eyes were very swollen. I had to look from the corner of my eyes. It was very difficult for me to see. I turned the mortgage twice in my hands, and tried to look out of the corners of my eyes; and the only thing I could see was the figures $1,300. I then advised Mr. Sadowsky I couldn't read it."

She also says: "Outside of my crying, my vision then was about the same as it is now." "While on the witness stand, I have read every word of the note and mortgage." Asked whether there was a part of the mortgage, as she read it on the stand, that she did not know was in it when she signed it, she quoted the clause in question. She says that she knew the other mortgage was for $1,300, but was not told that the new one was for a greater sum.

"When Mr. Sadowsky told me this mortgage was in form the same as the prior mortgage, except of a later year, I still hesitated. He then went and got a mortgage and showed it to me, of prominent people in our church, and said this mortgage was in form exactly like these people signed. It never occurred to my mind that he would do anything else but what was right. I then signed it, * * * because of the representations made by Mr. Sadowsky, and because of the confidential relations then existing between us."

Why she hesitated, or why other mortgages were shown to her, if they were not discussing the blanket clause (as will be seen, Sadowsky claims), is not explained.

. . The note given at this time is dated February 16, 1926, and is for $1,300, due in five years, with interest payable semi-annually. The husband was not there when the wife signed the note and mortgage. At that time, plaintiff held three other notes given by Edward Kriz, one dated October 26, 1925, for $1,200 and interest, payable on demand, and secured by ''Winter-Kriz stock'' as collateral; another for $1,200, dated November 12, 1925, payable on demand, secured by the stock mentioned; a third for $353, dated November 30, 1925, payable on demand. The present suit is to foreclose for these notes, as well as the new $1,300 note. Sadowsky testifies that the collateral was not sufficient; that, in making the loans, he took into consideration the land in question, and that:

''It was the understanding between us that, so long as these notes were unpaid, the property should not be transferred or incumbered. I knew at that time that Kriz was only half owner of this 40-acre piece of land.''

He makes no claim that the transfer to Emma Kriz was made to defraud the bank. Sadowsky says that he tried to be an advisor to both, that:

''I said, 'Mrs. Kriz, you know we loaned this money to your husband on the strength of his repeatedly telling us the property is unincumbered, and shall remain unincumbered as long as the indebtedness remains;' and I said, 'You know it, and this covers all of them, and I think it is only fair to the bank to ask this of you.' We talked about the matter, and finally I said to Mrs. Kriz, 'You don't have to sign it.' I said emphatically, 'You don't have to sign it,' and I further said, 'I don't want you to think there is any compulsion about it.' '' (Mrs. Kriz denies such an agreement).

Sadowsky further testifies that he said to her:

'' 'Before you sign this mortgage, you better take it and read it over,' and handed it to her. After she stood there fully three quarters of an hour, around by herself,—she wouldn't even sit down; and she picked up the paper and was reading it, holding it very close to her eyes * * * Then she asked about this particular clause, and I explained it further. * * * This was after I had gone over the matter with her in regard to the three

notes. She inquired what they were, and had made a number of inquiries when she was at the bank at different times. It was explained to her, after the mortgage was made, and before she executed it, that this mortgage was to cover these three notes. I said nothing about this mortgage was to be on the same form as the prior $2,000 mortgage, but did tell her that it was a new form."

He made the mortgage to recite a consideration of $1,300. The defeasance clause mentioned only the $1,300 note. He says he had been assured by counsel that the blanket clause was legal, and covered any other indebtedness Kriz might owe.

"So long as I had legal advice on that, I did not have to express the whole consideration in the mortgage. Q. In other words, it is your thought that this particular mortgage and all of this indebtedness owing the bank by these parties could be handled better if the full amount of the indebtedness was not expressed in the mortgage? A. Yes. Q. You could have re-drafted the mortgage for the full amount of the mortgage, and put in the whole amount owing the bank, instead of this $1,300, couldn't you? A. I could have done it,—yes. * * * Q. Yet, knowing all these things, you say you didn't do it? A. I did not."

He also says that he never anticipated any trouble with this mortgage, but, knowing of her change of mind (whether in regard to the transfer of the property or her domestic affairs, he does not say), he wanted the teller to take particular notice of what had been said, so she couldn't claim she had been misled, or that they had misrepresented. The teller testifies that Sadowsky asked Mrs. Kriz to read the mortgage.

"She was about 15 minutes reading it over, without talking about it. After she read it, they talked about it. She asked what would happen if she didn't sign it. He told her they would foreclose the mortgage."

Both of them, as does another witness, say that Mrs. Kriz was not crying.

Sadowsky says that the clause in question was talked over. Also:

"She took it up in this manner, quite a little period of time, until she came to the particular clause, that really wasn't in my mind, which says, any other debts or any other money that might be borrowed here. I said, 'I believe you are right, Mrs. Kriz, it is that way. I didn't say anything to you about that, for you know we often loan Ed Kriz money that is not on this mortgage.' * * * I did not say to Emma Kriz that I did not know that clause, the second paragraph, was in that mortgage. I never said that, I was not sure that clause in the mortgage included future loans. I was not concerned as to that, and it was not brought to my attention. I was referring to future loans, and not to existing indebtedness, absolutely. * * * I called Emma Kriz's attention to the fact that the mortgage covered other indebtedness, other notes, and asked her to read it over, and she called my attention to this same matter about future advancements. It was the part relating to future advancements that I had forgotten was in the mortgage,—that was the part of the clause I did not remember."

Defendant Rose Kriz testified that she had some difficulty in expressing herself in the English language; that Sadowsky attended to her family legal business, and she trusted him; that she loaned $1,400 to Edward and Emma Kriz, July 3, 1924, and $500, January 26, 1925, and had a mortgage from them on other property. When the notes came due, she asked Sadowsky to draw a second mortgage on the land in question, to secure the $1,900, and asked him, "Is it so, there is only $1,300 mortgage on that farm?" and he said "Yes;" that she believed him, and took the second mortgage in reliance on what he and another officer of the bank told her, that they were claiming only $1,300 for their mortgage. Her testimony is denied by the officials, one of whom testifies:

"Emma Kriz called me at the bank, and she said that Rose was driving her crazy, running after her for the $1,900, and wanted to do something to satisfy her. Then Rose came to the bank to see me, and came very nearly every day. * * * Then she [Rose] asked whether she could get a second mortgage on the 40, and I said, 'Rose, we have $1,300 mortgage on the 40, and it covers what either may be indebted to us.' * * * I told her that the total indebtedness of Ed and Emma Kriz to the bank,

including the indebtedness of Ed and Emma Kriz to Rose Kriz, was about $5,900. I went so far as to figure out that this would be about $150 per acre.".

The Rose Kriz mortgage recites that it is subject to a mortgage of $1,300, and it and the note were drawn by or under the direction of Sadowsky. The abstracter, Krska, testifies that, in a talk with Rose, he asked her why she did not take a new mortgage on the Marion property (on which she had a previous mortgage) and the farm, or on the farm alone; that he then looked up the records, and told her that the Corn Belt Savings Bank mortgage covered any indebtedness which the mortgagee may hold against the Krizes. Rose says that, after the mortgage to her was signed, she learned from the records that the Corn Belt Savings Bank was claiming more than the $1,300 on the land, phoned Emma, who said she did not believe it, and they went to the recorder's office and looked at the records. She admits having had a conversation with Krska before the $1,900 mortgage was drawn, in which (she says) he told her that it would be better to take the second mortgage on the 40, "because the Corn Belt Savings Bank had only $1,300 and my $1,900 would only make $3,200." She says that, after the $1,900 mortgage was drawn, she had a conversation with Krska, in which he told her, in substance, the same thing, and then looked at the record, and told her that the mortgage was for $1,300 and all other indebtedness.

The testimony cannot be all set out. Sufficient reference to it has been made to show its trend. Defendants argue with much force that, if it was agreed, as Sadowsky says, that the mortgage should secure the other notes, they might readily have been specified in the consideration and defeasance clauses. On the other hand, it might have made the mortgage debt look excessive as a bank loan. The use of such a clause is not to be commended, and it naturally arouses suspicion as to the good faith of the mortgagee in the transaction. It might in many cases not require much evidence of concealment, haste, or artifice to overturn it. Such a clause, on the particular facts, was sustained in *Turnis v. Ballou*, 201 Iowa 468. While the evidence offered in behalf of plaintiff is not free from inconsistencies and doubtful assertions, we are, nevertheless, persuaded that, in connection with admissions of Emma Kriz and the other testimony

and undisputed circumstances, Emma Kriz knew of the presence of this clause in the mortgage. In view of her having and inspecting this mortgage for an hour, and hesitating, and being shown other mortgages, and in view of her reading it at the trial without apparent difficulty, we think that she was fully aware of the disputed clause before she signed. While the property was then hers, it had previously been, in the half or the whole, the property of her husband, and as such, was to the extent of his ownership liable for his debts. Fraud or bad faith is not presumed. We are unable to find that she was deceived. There was no previous contract governing the terms of the mortgage then to be executed. Those terms were voluntarily settled and agreed upon.

The defendants assert the existence of a confidential relationship between defendants and Sadowsky, because of their intimate personal and business relations, and as between Emma and the bank, because Emma, in signing the mortgage for the three notes in controversy, did so as surety. Equity will not award a suitor for its remedies the fruits of a betrayal or abuse of confidence justly reposed in him. Whether a fiduciary or confidential relationship in this case exists, is not so much a question of law, as of fact. It may be found to exist in the absence of legal relationship. *Dawson v. National Life Ins. Co.*, 176 Iowa 362.; *Curtis v. Armagast*, 158 Iowa 507. A creditor may not take advantage of a contract of suretyship procured by him by deceit or fraudulent concealment. 32 Cyc. 59 *et seq.* The evidence shows that the parties were dealing at arm's length.

We are unable, also, to hold, on the record, that Rose Kriz was misled by the plaintiff or by the record.

Fraud, deceit, overreaching, abuse of confidence, are unproved. *First Nat. Bank v. Ten Napel*, 198 Iowa 816.

Defendants urge that plaintiff had no authority to accelerate the due date and declare due the $1,300 note. As has been shown, the three other notes were due on demand. They are  secured by the mortgage. There is in evidence a letter from plaintiff's attorneys, addressed to Edward Kriz, demanding the whole indebtedness due, and threatening to foreclose, if not paid by August 1, 1926. The petition was filed August 2, 1926. The mortgage stipulates that, in event of breach, the whole of

the indebtedness secured thereby, including principal and interest, shall, at the option of the mortgagee, without notice, become immediately due and payable. The validity of this provision is not assailed. The plaintiff was acting within its legal rights in accelerating maturity and in foreclosing. *Collins v. Nagel,* 200 Iowa 562.—*Affirmed.*

STEVENS, C. J., and DE GRAFF, ALBERT, KINDIG, and WAGNER, JJ., concur.