WILLIAM F. BURGER, Administrator, Appellee, v. J. L. KRALL et al., Appellants.

No. 40613.

MARCH 10, 1931.

*Donnelly, Lynch, Anderson & Lynch,* for appellants.

*Byington & Rate,* for appellee.

MORLING, J.—We give our attention first to three questions of fact: (1) Whether a relationship of trust and confidence in fact between decedent and defendants existed. If so, (2) whether defendants, through such relationship and in their dealing with decedent personally, obtained an advantage or profit. And if so, (3) whether the profit or advantage obtained by each was separable and several from that obtained by the other and obtained severally and separably from each other or jointly. The evidence is not materially in conflict. Only the conclusions of fact and of law to be drawn from facts proved are the subject of the controversy.

Decedent was never married. She was born in Bohemia, could not read or write, could speak English, but spoke Bohemian when talking with people of that nationality. She had been doing domestic work. An employer testifies that:

"She stopped working for us in November or December, 1925. She was very ill, had been poorly all fall, had a very bad goiter, and it was affecting her nerves, and she was very sick after that. * * * In the fall of 1925, when my sister was paying her for the work, she said: 'I am glad to get this money, because I want to buy my coal.' Then she spoke about her not working any more, and she said her brother [defendant Frank] had her money."

Decedent also had dropsy. She died May 29, 1928, at the age of 69, survived by three brothers and three sisters, and by nephews and nieces. She left a will, dated March 30, 1927, giving her property to her six brothers and sisters and a nephew, to be divided equally among them. She had a home, the proceeds of which were $1,900, which, with a check for about $60, given by Frank Fryauf to the administrator, the source of which does not appear, was the only property that came into the hands of the administrator. Defendant Krall is the husband of the daughter of defendant Frank Fryauf. Defendant Krall was at one time cashier of a bank at Hills, and later, cashier of a bank at Fairfax. Decedent had savings which, while Krall was cashier of the

Hills bank (prior to May, 1924), were deposited on certificate in that bank. The certificates were signed by Krall. A mortgage for $6,000, given by Bulger and wife, owned by the Hills bank, was, through Krall, sold to decedent. Whether decedent ever had personal possession of the mortgage does not appear. Krall told Bulger to pay the interest to defendant Frank Fryauf. Mr. Bulger testifies:

"He told us that Miss Fryauf had taken over the mortgage, and said something about Mr. Fryauf, having made up some of the amount. He said that he and Mr. Fryauf were looking after Miss Fryauf's business for her. He said that she could not read or write. We later went to see Mr. Fryauf, and told him we wanted to increase the loan, and wanted cheaper interest. He said they might do a little better. He was looking after Miss Fryauf's business. A little later, I saw Mr. Fryauf again, as to who I would have to pay, or about the papers, and he said they were at the bank."

Mrs. Bulger testifies that Mr. and Mrs. Krall "told us to pay the interest to Mr. Frank Fryauf, at Iowa City, and that he was handling this business for Miss Fryauf. Frank Fryauf ran a harness shop in Iowa City. Mr. Krall told us that Miss Fryauf had some money, and that she thought it would be a good place to invest it, so they added more to it, as she did not have that much. Krall told us that Miss Anna Fryauf was an aunt of Mrs. Krall, and that they were looking after her business."

The Bulgers paid off the mortgage October 23, 1924, by check for $6,390, payable to the order of decedent. This check was paid, and has upon it decedent's indorsement by mark, attested by Krall. For this fund, under date of November 3, 1924, the Fairfax bank issued a certificate of deposit payable to decedent, for $6,400, signed by Krall, as cashier, which is stamped "paid" May 4, 1925. This certificate bears no indorsement. On May 4, 1925, certificate in renewal for $6,500, signed by Krall, cashier, was issued. It was stamped "paid" November 2, 1925, and has indorsed on it the name of decedent by mark, in defendant Frank's handwriting. This certificate was taken up by two new certificates, dated November 2, 1925, for $4,000 and $2,500, respectively, payable to decedent, which, in turn, were stamped "paid" February 10, 1926, indorsed in the name of decedent by

mark, defendant Frank (and another) witnessing the mark. It will be noticed that the certificates up to February 10, 1926, were payable to decedent only, and that the date these last mentioned certificates were taken up was two or three months after decedent had "become very sick," and had quit working. These were taken up February 10, 1926, by new certificates of the Fairfax bank, one for $2,000, "payable to Self or Mrs. Nellie Grissel, or the survivor, or either of them;" one for $1,000, "payable to Self or Mrs. Frank Fryauf, Sr., or the survivor of either," one for $1,000, "payable to Self or Frank Fryauf, Sr., or the survivor of either or order;" one for $500, "payable to Self or Mrs. Charles Grissel or the survivor of either;" one for $500, "payable to Self or Frank Fryauf, Jr., or the survivor of either;" one for $500, "payable to Self or Mrs. Glenn Mathes or the survivor of either;" one for $500, "payable to Self or Mrs. J. L. Krall or the survivor of either;" one for $500, "payable to Self or J. L. Krall, or the survivor of either." Frank Fryauf, Jr., is the son, and Mrs. Glenn Mathes and Mrs. J. L. Krall daughters, of Frank Fryauf. By this means defendant Frank was getting, contingently, $1,000 for himself, $1,000 for his wife, and $500 to each of his three children, including the wife of defendant Krall, and Krall was getting $500. The testimony of defendant Krall and his wife, in substance, is that the certificates dated November 2, 1925, were delivered to Krall by decedent at her home, and the indorsements (in Frank's handwriting) were on them at the time Krall obtained them from decedent; that decedent said to him, "I want you to issue these certificates, as follows,"—giving him the names of the payees and the amount of the certificate to be issued to each; that, when the bank issued the new certificates, he delivered them to decedent; that he wrote out the directions, and "read it back to her, and she says, 'That is right—that makes $6,500, doesn't it?'" When the certificates were renewed again, August 9, 1926, they were for the same amounts and the same payees, except that the one to Mrs. Charles Grissel, Sr., was for $400, instead of $500. Krall testifies that decedent "instructed me to renew the certificates just as they were, with one exception,—she needed some cash, and wanted a $100 off of one, and asked me to make Mrs. Grissel's certificate for $400, instead of 500;" that they were delivered to decedent. The indorsement on the last two mentioned sets of certificates was in the name of decedent by

1164

mark, attested by Krall, or Krall and his wife. These certificates of August 9, 1926, were indorsed in the name of decedent by mark, and the indorsement witnessed by Frank Fryauf, and were renewed January 27, 1927. The renewals of January 27, 1927, were made in seven certificates,—six for $1,000 each. The six were each in the same form above set out, to "self," or, alternatively, one to defendant Frank Fryauf, Sr. ,another to his wife, another to his daughter Mrs. Glenn Mathes, another to his son Frank Fryauf, Jr., another to his daughter Mrs. J. L. Krall, another to J. L. Krall. The seventh was for $400. It will be noticed that Miss Grissel and Mrs. Grissel, the payees in the next previous sets, were dropped. The certificates of January 27, 1927, were taken up by six certificates, dated February 11, 1928, each for $1,-000, payable in like manner, "to Self or," alternatively, one each to defendant Frank, his wife, his same two daughters and son, and Krall. These were indorsed in the name of decedent, by mark witnessed by both defendants. They were payable in six months, but were renewed in about three months,—viz., May 3, or May 23, 1928,—except the one in which the wife of defendant Frank was named. She had in the meantime died, and the amount of that certificate had been paid to defendant Frank Fryauf, as defendants testify, by decedent's instruction. The renewals of May 23 (or 3), 1928, were in five certificates, for $1,000 each, "payable to Self or," respectively, to defendant Frank, to his two daughters and son, previously named, and defendant Krall. These certificates were, in terms, payable in three months from date, but were paid to the respective alternative payees June 2, 1928, less than a month after date, and three days after decedent's death. Thus $5,000 of the money which decedent had on deposit has found its way into the hands of defendant Frank and his children, including the wife of Krall, and $1,000 into the hands of Krall. These alternative payees gave no value for the certificates. The certificates, of course, as between the bank and the payees, evidence contracts (barring any question of fraud and notice through Krall, not here involved) ; but no question of contract, or the rights of the parties based upon contract, between the bank and decedent or the payees, is here involved. The money represented by the certificates belonged to decedent, and has been distributed by the defendants to themselves and to the children of Frank, including the wife of defendant Krall. Defendant Frank testifies:

"I didn't have nothing to do. She took care of her own business, and I just kept a box in the bank for her. Before Anna died, I remember that my name appeared in some of the certificates."

It was conceded at the trial that:

"The records show that this certificate [evidently meaning either the check for the proceeds of the mortgage or the certificate for $6,400 dated November 3, 1924,] was delivered to Frank Fryauf."

Krall testified that the certificates of January 27, 1927, were delivered to him by Frank Fryauf at Fryauf's home in Iowa City. As has been noted, Frank Fryauf witnessed decedent's indorsements. Krall testified that he, at decedent's directions, returned the certificates of February 11, 1928, to Fryauf; that they, later on, came into his possession from Fryauf; that, at the time he took them to the home of decedent, Frank Fryauf, Krall's wife, and decedent were there, and that was the occasion that decedent directed Krall to make the payment to Frank of the proceeds of the certificate payable alternatively to Frank's wife. The attorney who drew decedent's will testifies that decedent told Frank to take it, and put it in his box for safe-keeping, and that Frank was named in the will as executor, but refused to act. One of decedent's employers testifies that, on one occasion, decedent told witness "she had given her money to her brother Frank to take care of it for her, and she had put it in the Fairfax bank, she thought,—at least most of it;" "that she was placing some money with him for investment, and on another time, that she was giving Frank something to put in his box for her."

Clearly, decedent was not taking care of her own business, but it was being handled by defendants. On one occasion, several years before decedent died, according to the testimony of one of her sisters:

"I recall one time when John Krall and my brother Frank was there at the home, one evening, several years before she died. I saw Frank Fryauf go in, and John Krall was standing at the corner, about a half a block from the house, back of a little shed. Frank came out, went over to the corner, and went back to Anna's house; and when Frank went out the second time, I went

over to her place. When he went out the second time, he went to Krall, on the corner. I don't know what they then did. A day or two later, I stopped at the shop, and asked Frank what they were doing there that night, and he said that it was none of my business.''

Neither Frank nor Krall denies or explains this circumstance. They offer no explanation of the making out of the certificates as indicated, except that decedent directed that they be so made out. These directions, if given, were given at a time when decedent was very sick. Krall and wife, or Krall and wife and Fryauf, were present. Though decedent was unable to read or write, she, according to defendants' claim, mentally computed the total of the certificates. Defendants say that, on the last renewal, she directed renewals in the same forms, in the same names, and that they be held at the bank, and, as soon as she died, be delivered to the parties named therein. It is undisputed that decedent expressed dislike for Mrs. Glenn Mathes and her husband; that she spoke of Mrs. Nearad as having been a good sister; that she said, ''All that I have is to be divided among my family,'' and that she expected everyone to have an equal share; that she said that she did not know how she could get along without Mrs. Nearad; that, during the two years of decedent's illness, ''the one year she was able to be around with us, to take care of herself a little bit, and about a year, she was hardly able to do anything. * * * The last year or so, she wasn't hardly able to get around—she had dropsy so bad, and I [Mrs. Nearad] would cook meals and take them over to her, and done her washing and ironing and took that over to her. * * * usually breakfast, she got herself, and then I took her dinner over, and she usually ate part of it and had the other part for her supper, that she warmed over. * * * She always never liked Glenn and Agnes, and she always said that whatever she had left after she was gone, that they would never get a penny of her estate, or anything out of it—she always told us that [giving her reasons] * * * Just the Thursday before she died, she told me,—she said I shouldn't worry,—there was no trouble about it,—she had everything fixed, and it was going to be divided between her brothers and sisters that was left * * * She said that, different times.'' This testimony was corroborated by that of decedent's brother William. No objection to the competency of these wit-

nesses is made. It is not claimed that decedent had the benefit of independent advice.

On this record, it cannot be seriously disputed that decedent did intrust to defendants the transaction of her business with respect to the deposits in question; that she put confidence in them; that she relied upon them; and that they did, in  fact, jointly transact this business for her. They were not acting in the execution of several or separable agencies or trusts, or independently of each other. Their conduct of this business was joint and inseparable.

A relationship in fact of trust and confidence existed between the decedent, on the one hand, and defendants, on the other. While decedent's trust and confidence in defendants in the transaction of this particular business existed, and while defendants were ostensibly conducting for her the business intrusted to them, they obtained therefrom for themselves profits and benefits. Decedent was very sick, illiterate, inexperienced, and without the benefit of independent advice. Defendants were in a position of superiority or dominance. Decedent was in a corresponding position of inferiority and subservience. Her sentiments toward her other brothers and sisters, and particularly to Mrs. Nearad, who had served her so faithfully, and decedent's expressed intentions toward them, were thwarted. No purpose or reason for favoring defendants is shown. The circumstances loudly cry fraud; but if there is doubt about the sufficiency of the evidence to show actual fraud, equity, from the proved relationship and the advantage obtained by defendants therein, implies fraud, and demands of defendants proof that decedent, in extending to defendants the profits and advantages which they now claim, acted with freedom, intelligence, and full knowledge of all the facts. *McNeer v. Beck*, 205 Iowa 196; *Curtis v. Armagast*, 158 Iowa 507; *Pruitt v. Gause*, 193 Iowa 1354; *Roller v. Roller*, 201 Iowa 1077. See, also, *Albaugh v. Shrope*, 197 Iowa 844; *Osborn v. Fry*, 202 Iowa 129; *Corn Belt Sav. Bank v. Kriz*, 207 Iowa 11; *Utterback v. Hollingsworth*, 208 Iowa 300; *Stonewall v. Danielson*, 204 Iowa 1367.

Defendants have not discharged the burden which equity imposes upon them. They must, therefore, account to the estate for the $6,000 which they have diverted. Their liability extends

to the advantages obtained in the names of or for their wives and children. *Haman v. Preston,* 186 Iowa 1292.—*Affirmed.*

FAVILLE, C. J., and EVANS, KINDIG, and GRIMM, JJ., concur.