W. D. MERRITT, Administrator, et al., Appellees, v. E. ROY EASTERLY, Appellant.

No. 44517.

MARCH 7, 1939.

C. J. Lynch and William M. Dallas, for appellees.

J. E. Remley and Harold E. Davidson, for appellant.

BLISS, J.—The appellee, W. D. Merritt, is the administrator with the will annexed of the estate of Harriet E. Rummell, deceased. The appellee, Consolidated Independent School District, is the residuary legatee and devisee of the testatrix. The appellant is the grantee in two deeds, executed by the deceased, and conveying to him eighty acres of land in Thayer county, Nebraska, and one hundred eighteen acres in Jones county, Iowa. He also took possession of two certificates of deposit, and the proceeds of a third certificate, all of which were originally issued to the deceased, and certain other personal property.

The petition of the appellees alleges that for more than two years prior to her death on April 6, 1937, when she was more than eighty-seven years old, the health of the testatrix was so impaired, and her mental and physical powers had so failed, that, at the time the transfers and conveyances of property were made, she did not have sufficient mental capacity to

make them. The petition further alleges that during this period a fiduciary and confidential relation existed between the testatrix and the appellant, and that the latter took complete charge of all the property and the business affairs of the testatrix, and by reason of her implicit trust and confidence in him, and his dominance over her, he acquired the title and possession of the property in controversy. Appellants prayed for an annulment of these transfers, for a return of the personalty and all income and rentals, for a reconveyance of the Nebraska real estate, the quieting of title to the Jones county real estate in them, and for general equitable relief.

The appellant in his answer denied generally, and alleged that he had performed valuable services for the deceased for many years, for which he had not been paid, and that the transfers of all of the property had been made to him voluntarily by the deceased as a gift because he had not been compensated for his valuable services or for the many kindnesses he had bestowed upon her. The trial court granted relief to the appellees, as prayed.

For the court, at this time, to discuss, at length, the equitable or legal principles and the authorities having to do with the issues involved in this action, would be a work of supererogation, in view of the able and exhaustive discussions of principles and collations of authorities, by Justice Weaver, in Curtis v. Armagast, 158 Iowa 507, 138 N. W. 873; Justice Evans, in Johnson v. Johnson, 196 Iowa 343, 191 N. W. 353; Justice Kindig, in McNeer v. Beck, 205 Iowa 196, 217 N. W. 825; Justice Morling, in Utterback v. Hollingsworth, 208 Iowa 300, 225 N. W. 419; Justice Mitchell, in Ennor v. Hinsch, 219 Iowa 1076, 260 N. W. 26; Justice Richards, in Jensen v. Phippen et al., 225 Iowa 302, 280 N. W. 528; and in Vorse v. Vorse, 186 Iowa 1091, 171 N. W. 186; Sullivan v. Kenney, 148 Iowa 361, 126 N. W. 349; Good v. Zook, 116 Iowa 582, 88 N. W. 376; Pruitt v. Gause, 193 Iowa 1354, 188 N. W. 798; Hull v. Mitchell, 181 Iowa 51, 162 N. W. 235; Drefahl v. Rabe, 132 Iowa 563, 107 N. W. 179; Fitch v. Reiser, 79 Iowa 34, 44 N. W. 214; Spargur v. Hall, 62 Iowa 498, 17 N. W. 743; Lampman v. Lampman, 118 Iowa 140, 91 N. W. 1042; Burger, Admr. v. Krall et al., 211 Iowa 1160, 235 N. W. 318.

The appellees, in their petition alleged both mental incapacity and undue influence. If their cause of action depended

upon the establishment of either of these issues, the burden would be upon them to prove the same by clear, satisfactory and convincing evidence, in order to set aside the conveyances. Curtis v. Armagast, supra; McNeer v. Beck, supra; Johnson v. Tyler, 175 Iowa 723, 157 N. W. 184; Sutherland State Bank v. Furgason, 192 Iowa 1295, 186 N. W. 200; Zinkula v. Zinkula, 171 Iowa 287, 154 N. W. 158; Brackey v. Brackey, 151 Iowa 99, 130 N. W. 370.

But coupled with these allegations is the additional one that the conveyances of the real estate and the transfers of the personal property were procured by the appellant, while he was the dominating person in a fiduciary and a confidential relation, existing between him and the deceased. As stated in Thomas v. Whitney, 186 Ill. 225, 57 N. E. 808, 810:

"There is a well-defined distinction between undue influence arising from acts which the law deems fraudulent and undue influence resulting from fiduciary relations existing between the parties. * * * Pomeroy, in his work on Equity Jurisprudence (vol. 2, § 955), says: 'Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject (undue influence) than the treatment of actual undue influence and fiduciary relation as though they constituted one and the same doctrine.' The same author says (section 947): 'The term "fiduciary or confidential relation," as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?' "

"While the phrases 'fiduciary relations' and 'confidential relations' are frequently used as convertible terms, strictly they are of differing significance." Jensen v. Phippen, 225 Iowa 302, 303, 280 N. W. 528, 529, and Curtis v. Armagast, both supra.

The American Law Institute defines the terms, thus:

"A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within

518

the scope of the relation. * * * Fiduciary relations include not only the relation of trustee and beneficiary, but, also, among others, those of guardian and ward, agent and principal, attorney and client. * * * Although the relation between two persons is not a fiduciary relation, it may, nevertheless, be a confidential relation. A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship or one of friendship or such relation of confidence as that which arises between physician and patient or priest and penitent." 1 Restatement of The Law of Trusts, section 2b.

The phrases are used by the courts and law writers as convertible and synonymous terms. Bacon v. Soule, 19 Cal. App. 428, 126 P. 384; Ewing v. Ewing, 33 Okla. 414, 126 P. 811. We have no intention of fettering the operation of the principles which have been consistently followed by this and other courts in cases of this kind by undertaking to define the various confidential, or fiduciary relationships, or the precise limits thereof.

No witness in this case testifies to any false, or fraudulent representations which the appellant made to the deceased, or to any deceit or trickery which he practiced upon her. In the view which we take of the case such proof is not necessary to support the decree. As stated by this court, in Burger v. Krall, supra, 211 Iowa 1160, on page 1167, 235 N. W. 318, on page 321:

"The circumstances loudly cry fraud; but if there is doubt about the sufficiency of the evidence to show actual fraud, equity, from the proved relationship and the advantage obtained by the defendants therein, implies fraud, and demands of defendants proof that decedent, in extending to defendants the profits and advantages which they now claim, acted with freedom, intelligence, and full knowledge of all the facts."

The rule to guide us in this case has been very well and fully stated by Justice Morling, in Utterback v. Hollingsworth, supra, 208 Iowa 300, on pages 302 and 303, 225 N. W. 419, on page 421, as follows:

"Plaintiffs take their main position on the proposition that defendants sustained to decedent a confidential relationship, such as to shift to them the burden of proof. It is not claimed, of course, that the relationship was fiduciary, as matter of law, but that it existed in fact, within the doctrine of Curtis v. Armagast, 158 Iowa 507, 138 N. W. 873; Pruitt v. Gause, 193 Iowa 1354, 188 N. W. 798; 2 Pomeroy's Equity Jurisprudence (4th Ed.), section 956. This doctrine, for the purpose of the matter now under discussion, may be stated to be that one who in fact stands in a confidential relationship to another may not retain advantage of a transaction with the *cestui que trust* which may reasonably be the result of the confidence reposed, unless he shows that the *cestui* acted with freedom, intelligence, and full knowledge of all the facts. The purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence. It is a prerequisite to the application of the doctrine that faith and confidence be reposed; that the repository shall be thereby in a position of superiority or dominance, while the *cestui* is in a corresponding position of inferiority or subservience. Proof of active exercise of undue influence in fact, or the existence of mental weakness or incompetency on the part of the *cestui*, is not essential to the application of the doctrine. 2 Pomeroy's Equity Jurisprudence (4th Ed.), section 955 et seq.

"Undue influence, for the purpose of the point now under consideration, is a phase of actual fraud, and its existence, or the existence of mental incapacity, is sufficient, of itself, to invalidate the transaction; but, in the case of dealings between the trustee and the *cestui que trust* in which the trustee obtains an advantage or benefit, though the *cestui* acts in his own behalf, the transaction is, in equity, presumptively the result of over-reaching or of fraud, and its validity must be affirmatively established by the trustee. Before the doctrine can be applied, however, the existence of the confidential relationship or the facts giving rise to it must be proved. The relationship must be such as to enable the one charged with having abused it to have exercised it to his advantage. It must appear expressly or by implication that trust or confidence was reposed. The supposed trustee must be shown to have been in a position of advantage or superiority such as to imply a dominating influence over the *cestui*."

With these principles in mind let us go to the record in this case. It is long and the testimony extends over quite a wide field. We will not attempt to review the testimony of the many witnesses, but will set out only so much of the undisputed or little disputed testimony as may be necessary to give the reader an adequate narration of the facts.

The first and most important question for determination is, Was there a fiduciary or a confidential relation existing between the appellant and Harriet E. Rummell, during the period when the property transfers were made?

Harriet E. Rummell was the widow of D. E. Rummell, who had died in 1910. He had been a prominent citizen and business man of the town of Olin, and for many years he had taken a great interest in the schools of the town, during most of which time he had official connection with the administration thereof. He had donated the bell for the school building, and in other ways had shown his deep interest in the welfare of the school. His wife had always taken an active interest in the various community interests, such as chautauquas and similar activities. No children were born to them, although an adopted girl had died. After her husband's death, she lived alone for many years, doing her own work except the heavier cleaning. She was an intelligent woman, keeping a library of good books in the home. On January 30, 1929, she drew her own will, in proper form and properly witnessed. She provided for the payment of burial expense, and distribution of personal effects. In it she briefly described the property which she then owned. After bequests of $100 each to the Soldier's Orphans Home at Davenport, The Christian Home Association of Council Bluffs, and the American Home Finding Association of Ottumwa, came the following provision:—

"The Remainder of my Estate to be given to the Olin Consolidated School—To the memory of D. E. Rummell."

This will was duly probated, although the following codicil was not probated because of defective execution. It was as follows:

"Codicil.

"My property has many changes since this will has *bin* made, but what is left at my death goes to the Olin Consolidated School as stated in my will.

"Witness: Libbie Butler, Signed June 26, 1935. Harriet E. Rummell."

With the exception of the home and the Nebraska eighty acres (acquired in 1901) the property of Mrs. Rummell was mostly cash or securities, at the time the will was made. At that time she owned a mortgage of $4,000 on the 118-acre Jones county farm. She had a government pension of $40 a month. After commencing a foreclosure action, the mortgage debt was satisfied by her taking a deed to this farm, dated November 27, 1931, and filed for record December 1, 1931.

Mrs. Kiburz, a grandniece of Mrs. Rummell, and a second cousin of appellant, as a witness for the latter, testified to a conversation with Mrs. Rummell, as follows:

"Mrs. Rummell told me sometime between 1927 and 1930 that she had made a will. This conversation took place in her home and no one else was present and Mrs. Rummell told me she had made a will and having no direct heirs she had made the Olin Consolidated School District her chief beneficiary. Her reason for doing so was there was such a large family of nephews and nieces and her estate if divided among them would amount to so little for each, in making the gift to the Consolidated School District they would benefit. When the School District was formed there had been considerable objection and it had been a very difficult situation and they were badly in need of funds and she felt that leaving it to the School District in the main that it would result in reduction of taxes and thereby benefit members of her family. And then her husband had been a member of the School Board."

The relatives of Mr. and Mrs. Rummell were quite numerous, and she appeared to have been on friendly terms with all of them. She canceled a note of $800 which the appellant's brother owed her. For ten or more years prior to 1930, she had been hard of hearing, and this affliction increased so, that in her later years, it was difficult to carry on a conversation with her. Dr. White, a member of the appellee school board, lived in the same block with the deceased since he was five years old. He was fifty-five years old when he testified. He was her doctor. Since 1930 he saw her in her yard and she did not seem to recognize him. He attended her professionally in

November and December 1935, and in May 1936. She was suffering from endocarditis, myocarditis, arteriosclerosis, and senile dementia. During all of this period he could not carry on connected conversation with her, and she asked no questions indicating independent action. In his opinion, during all of this period she lacked mental capacity to understand the nature and effect of business transactions. As is usual in cases of this character, there was considerable testimony, on both sides, as to her mental incompetency, and her mental competency. Much of the latter testimony was from witnesses interested in behalf of the appellant, some of whom were very close relatives. There was the customary testimony of failing to remember names and events, or to recognize the faces of close friends and relatives. With the exception of having considerable difficulty in getting about because of her weight and leg weakness, her physical condition was not so bad for a person of her age, prior to her sickness in November 1935. She became seriously ill at that time and remained so for several weeks, and thereafter required the care of a practical nurse until her death. A neighbor lady, Mrs. Switzer, not a relative, who had lived next door since December 1934, used to call upon her frequently with some article of food which she thought Mrs. Rummell might enjoy. On one of these occasions, prior to her illness in November 1935, she called upon her, and testified concerning the visit, as follows:

"Q. Now, tell us about that incident. A. Well, that was just a short time before she had this awful sick spell in November, and she was sitting alone there at that time, and I went there one afternoon, and I—at first when I went in she acted kind of strange, and I didn't know whether at first, whether she knew who I was or not. Then finally she says, I am awful glad you came over, but she had seen me come out of the house, of course, her house is right beside that. She says, I am awful glad you came over, she says, all day long I have been trying to think what my name is and I can't remember it; I am so afraid I am going to be like some other old people, and I don't want that to happen.

"Q. Did she ask you what her name was? A. Yes, she did.

"Q. Did you tell her? A. Yes.

"Q. What did you tell her her name was? A. Harriet Rummell.

"Q. After you told her her name was Harriet Rummell did she appear to recognize that to be her name? A. Well, she seemed awful nervous and worked up, she said that she was afraid she was going to lose her mind, and I tried to comfort her, and I told her not to think anything of it, because all old people get forgetful. * * *

"After this sick spell she was more helpless and she complained of not having the use of her limbs. She had help a good share of the time in getting around the house. After her sickness I would go in and take a hold of her hand and speak to her but it was almost impossible to make her hear. Mrs. Cruise sometimes would try to make her understand but I do not know whether she would or not most of the time. * * *

"Mrs. Cruise would get up close to her ear and try to tell her who I was. It was a conundrum to know most of the time whether she understood or not. That was the situation the rest of her life. * * * After she had that sick spell she never spoke of what she had read. Before that we used to discuss books and current events and things like that when I first went there, but after the sick spell we never did."

Mrs. Cruise, her nurse, and a witness for appellant, told of an occasion, when Mrs. Rummell attempted to telephone her husband, who had been dead for many years, and tell him to come home. She thought her parents, long gone, were still living. Mrs. Cruise and the appellant both testified, that she thought she was not in her own home, and for that reason the doors were kept locked to prevent her from getting out, as she wished to go home. After November 1935, she gave no attention whatever to business or household affairs, and rarely left the house. She had given scarcely any attention to the farms for five or six years. It had been necessary for her to use eyeglasses for years. Mrs. Swenson, a daughter of appellant, who readily testified to many matters favorable to his cause, said that she never saw Mrs. Rummell do much reading after her illness. She would look at the Cedar Rapids paper a little bit. In going through a scrap book of newspaper clippings, she could read the headlines and the large print with glasses, but the witness would have to read the body of the clipping.

E. Roy Easterly, the appellant, was a son of Mrs. Rummell's brother. At the time of the trial in 1938, he was sixty-

seven years old. He was a man of considerable business experience, and owned and operated a farm for many years near Olin. He had acted as referee in partition sales, as guardian, and as administrator in estates. He looked after his mother's estate in Nebraska, near the Rummell eighty acres. After his wife's death, he moved to Olin, and in 1930 he lived within a block of Mrs. Rummell. He visited her frequently during the years that she lived alone. He was kind to her and she often referred to him as "her boy". From 1930, and perhaps earlier, he looked after the Nebraska land, made four trips out there, in connection with his mother's estate. It was unimproved and unfenced. There was little revenue from it. From the time that she acquired the Jones county farm in November 1931, the appellant handled it as though it were his own. He attended to the leasing, collecting the rent, disposing of the landlord's share of the crops, making repairs, although Mrs. Rummell at one time told the tenant's wife that she would pay for screening the porch. He admitted that he never made an accounting of the receipts from this farm in 1932, 1933 and 1934. He sold her share of the crops for 1932, 1933, 1934, 1935 and 1936. When Mrs. Rummell became sick in November 1935, he moved into her home and thereafter boarded and lodged there at her expense, except from April to October 1936 when he stayed with his daughter on his farm, but came to town almost every day to see Mrs. Rummell. He was quite "near" with his money. While he was enjoying free living at her home he occasionally brought something for the table, and whether it was a head of cabbage, turnips, or a piece of cheese, he charged the five or ten cent item to the house. He took the deed to the Jones county farm on March 3, 1937, as a gift, he claims, yet he paid the 1936 taxes, out of her estate funds. He evidently considered the donation as free and clear of all liens and incumbrance. From November 1935 on, he took complete charge of her affairs and attended to every detail. He took charge of her bank account and check book and made all deposits and withdrawals. He took her certificates of deposit, collected interest thereon, renewed them, and prepared indorsements for her to sign. When she died he was the payee in two of them. Prior to her death he prepared a note to the bank, signed by her directing the bank to insert his name as a co-payee with her in another certificate. It was done, and on its maturity, he collected the $500 principal and

$12.50 interest, and put the $500 in his safety deposit box, and the "twelve fifty" in his pocket. Within a year and a half of her death he took possession of a memorandum book in which she had written some private notations concerning various ones of her relatives. He contracted and paid for all of the household expenses. He hired the nurse, reduced her wages from time to time, and paid her. He paid Mrs. Rummell's church dues, her taxes and bills of all kinds. All out of her money. He received and collected her pension checks, except a half-month payment. He listed her property for taxes, signed her name to the assessment rolls, and he took the oath for her, by proxy. He kept the rent, notes, leases and the certificates of deposit in his safety deposit box. He lived in her home for approximately a year after her death. Nothwithstanding he had possessed himself of substantially all of her property except her home, household effects, and some crops and rentals, he qualified as administrator of her estate and acted as such until removed, on citation, by the court. The principal amounts in the three certificates of deposit aggregate $1,300. The only evidence that she gave him these certificates is her indorsement thereon, and the notation to the bank. This is very indefinite proof of a gift. He admitted that the endorsement, "Mrs. Harriet E. Rummell" on the certificate, dated March 2, 1936, is in his handwriting. Each check drawn against her bank account was signed with her name by the appellant. With respect to the $1,195.61, which he admits was her money collected by him as "her agent", he states that, from November 1935, until he produced it in court, in October 1937, he kept it in his safety deposit box, with the valuable papers which she turned over to him.

. He performed for her every duty and every service which a guardian would perform for a ward. Had he not done so, it would have been proper and necessary to have had a guardian appointed for her. The foregoing testimony is undisputed. Much of it came from the appellant. The following is his testimony:

"Q. Well, in other words, during this period from December 1, 1935, you had full control as agent of all of Mrs. Rummell's money and paid the help out of her money, and paid the groceries out of the money, and paid the light and paid all

of the various and sundry items, did you, for the household? A. I believe I did. * * *

"Q. And had assumed, during that period, assumed all of the control of all of her property and every transaction of every kind and nature; that is true, isn't it? A. Practically so, I believe. * * *

"Q. And during this time you were agent for your aunt you succeeded, one way or another, in getting everything she had, including the Nebraska land, certificates of deposit, and the Jones County land, and everything except her homestead? A. *She gave it to me, yes, that is, on conditions, of course no witness to that.*

"Q. And there isn't, outside of yourself, a living person that has any personal knowledge of these transactions, is there, that you know of, outside of the Notary Public who knew of the signing of the deeds? A. I don't know as there is.

"Q. You knew your aunt was so helpless and incapacitated she hadn't any opportunity to consult, and had consulted with no one, outside of yourself, in relation to any of these matters, didn't you? A. She had opportunity when folks came in, but not for her to go out.

"Q. You didn't know of any one coming in she did consult with, do you? A. No, sir. * * *

"Q. In other words, you had charge of handling those certificates, renewing them when they became due, looked after and had physical possession of the certificates? A. Yes.

"Q. That is the situation as it was when you say they were turned over to you. You, her agent, depositing her money, and having control and possession of her certificates, now turn up claiming you own them, do you? A. Well, by, you might, say, a gift, I suppose you call it.

"Q. You, acting as this eighty seven year old aunt's agent, were looking after the land for her? A. I had been, yes.

"Q. She was at home helpless and you did do that? A. Yes.

"Q. She was unable to see after it and do anything for herself, and you felt you should and did look after all her affairs, anyway, is that right? A. Yes.

"Q. Then you went down and got Blayney, the notary public, and told him to make out a deed to you for the 118 acre farm, did you? A. Yes sir.

"Q. You left his office, telling him you would let him

know or come and tell him when to go and have the deed signed, didn't you? A. Yes, I believe I did.

"Q. Then you waited until the women about the house, and the lady there caring for your aged aunt, went off to a church gathering, didn't you? A. Well, I don't know whether she went to a church gathering.

"Q. She went somewhere? A. I don't remember, now, I think she was gone.

"Q. You waited until she was gone, and nobody at the house but your sick and ailing eighty seven year old aunt; she was the only one there? A. Mr. Blayney.

"Q. At the time you went after Blayney you knew she was the only one there at home? A. Well, I suppose, if she was gone.

"Q. Then, leaving your invalid aunt in the home, you went down and got the notary public, whom you had previously arranged to have the deed prepared by, and took him up there to the house, did you? A. I suppose I did."

The deed just referred to was the deed obtained from Mrs. Rummell, on March 3, 1937. She died April 6, 1937. She had nothing to do, so far as the record discloses, with arranging for the preparation or execution of this deed. The appellant gave Blayney the description of the real estate, and told him to prepare the deed, but not to come to the Rummell house, which was just a block away, until the appellant notified him. The appellant returned to the home, and when Mrs. Cruise had left for the church meeting, he called Blayney, and he came. Did the appellant leave Mrs. Rummell's room when he came so that she might talk to Blayney about the deed? No. The appellant remained to read it to Mrs. Rummell. And as further proof of the secrecy of the transaction, the appellant and Blayney admitted that the former had told the latter that he would prefer that Blayney say nothing about the deed. The appellant took the deed and kept it in his possession until the day of the death of Mrs. Rummell, and that very day, it was recorded at Anamosa, fourteen miles away.

This court, at different times, has referred to the matter of independent advice, in cases of this kind. In Pruitt v. Gause, 193 Iowa 1354, 1359, 188 N. W. 798, 801, supra, we said:

"There is no pretense, even by the defendant, that the old

gentleman had the opportunity or advantage of independent advice from any source, and this fact alone has often been held sufficient to set aside deeds and contracts obtained under such conditions.''

■ ''Independent advice'' has been well defined and described by the New Jersey court, in Post v. Hagan, 71 N. J. Eq. 234, 65 A. 1026, 1027, 124 Am. St. Rep. 997, as follows:

''By force of this rule, if a person upon whom another has in fact come to be dependent accepts a gift from such dependent person of all of his or her estate, a court of equity, moved by the apparent improvidence of such gift, casts upon the donee the burden of showing that the donor had the benefit of proper independent advice. 'Proper independent advice,' in this connection, means showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction.''

Not even the appellant contends that Mrs. Rummell had independent advice respecting any of his questioned transactions. We have extended this opinion much beyond what we intended, but we are constrained to repeat again the sage comment of the late Nestor of this court, Justice Evans, in Johnson v. Johnson, 196 Iowa 343, 348, 349, 191 N. W. 353, 355, supra:

''It is a rare case where the dominant individual in a fiduciary relation can sustain a gift to himself by the one who is dependent upon him. Whereas the defendant had assisted her husband in his few matters of business before his illness, she had now, by his illness, become his sole dependence. If someone else had sought to obtain a conveyance of his property, she would have been his independent adviser, and would have protected him against ill advised action. Inasmuch as she became the beneficiary of this transaction, he was necessarily deprived of her help and advice. In such a case, equity inquires, Who was his helper? Did he have any? Did he have independent advice, legal or otherwise? If his wish had been to refuse the gift, was there anyone to stand for him and to put

forward the refusal? It is incumbent upon the defendant to make some answer to these questions.''

In every other business affair the appellant was her actor, her adviser, her alter ego, her ''other I''. He even raised his hand and took her oath. With reference to Mrs. Rummell, we ask, in the words of Justice Evans, ''Who was her helper? Did she have any? Did she have any independent advice, legal or otherwise? If her wish had been to refuse the gift, was there any one to stand for her and to put forward the refusal?''

There is no question but that Mrs. Rummell had implicit faith and trust in the appellant. His witness, Mrs. Kiburz, testified:

''She indicated that she was much dependent on him and had full confidence in him; that she felt that he was trustworthy, and she could depend upon him, and she did trust him; that he looked after her financial affairs and property.''

Mrs. Cruise, appellant's witness, testified:

''She depended more on him all of the time. She wanted him more all of the time. When he was away for short periods of time she would speak about him being away and about her dependence on him, and worried until he got back. She seemed to have the utmost and implicit confidence in him and rested and relied upon him in all ways.''

The procurement of the deed to the Nebraska land on June 18, 1935, was also accomplished through Blayney, and under circumstances, somewhat similar to those of the deed of March 3, 1937. The procuring of the first deed was not so flagrant a breach of trust as were the later transfers. Her physical and mental conditions were not so impaired, at that time, as they were after November 1935. However, it was prior to November of that year that she told Mrs. Switzer of her inability to remember her name. We place credence in that witness' testimony because she impartially helped and hurt both sides. For three or four years prior to June 1935, he had been her agent, looking after this and the other farm, collecting the rents and keeping same. In passing upon his inclinations and actions in acquiring the Nebraska farm, we must consider just what he did in acquiring the Jones county farm and the certi-

ficates of deposit. Men do not suddenly become covetous at his age. His own testimony, set out herein, condemns him in each and all of his questioned dealings. He took over $7,000 worth of this woman's property, and left her property, which the tax inheritance commission appraised at $1,941.37. To be sure, she willed her property to the school district, instead of a relative, but that was her right, and her reasons were sound. It was a worthy and sensible monument to the memory of her departed husband.

We have no hesitancy in saying that both a fiduciary and a confidential relation existed between the appellant and Mrs. Rummell. The relation was fiduciary in that he had assumed control of all of her property and handled and managed it as he saw fit. The relation of principal and agent existed. In fact there was a de facto guardianship. Under these cirsumstances and relations he owed her a duty to act solely for her benefit. The relation was also a confidential one, because she had abiding faith and trust in him, and relied upon him to advise and act with her interest only in mind.

Since that relationship existed between the deceased and the appellant, the burden was upon the appellant to rebut the presumption of overreaching on his part, and to affirmatively establish that in his acquisition of property, in the transactions in controversy, he took no advantage of the deceased by reason of their relationship, but that she acted voluntarily with freedom, intelligence and a full knowledge of all of the facts. We have carefully gone through the record and it is our judgment that the appellant has failed to carry this burden.

The courts must scrutinize with jealous vigilance transactions between persons sustaining relations of trust and confidence, to the end that the dominating member shall conduct himself with uberrima fide—the utmost good faith. As stated in Hull v. Mitchell, 181 Iowa 51, 58, 162 N. W. 235, 237, the appellant "was not only her agent but the absolute manager, and had full control of all her affairs, and this relation warrants the presumption that he procured the deed by undue influence."

To overthrow the decree of the trial court, would be to weaken the safeguards which courts of equity have always thrown around the weak and the helpless, and would tempt others to benefit themselves through like misconduct.

The decree appealed from is affirmed in all of its provisions.

In view of our decision, we do not pass upon appellees' motion to dismiss the appeal.—Affirmed.

MITCHELL, C. J., and HAMILTON, RICHARDS, STIGER, HALE, OLIVER, MILLER, and SAGER, JJ., concur.